[No. B205943. Second Dist., Div. Five. Dec. 19, 2008.]

AMERICAN CIVIL RIGHTS FOUNDATION, Plaintiff and Appellant, v. LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant and Respondent;
ANA CECILIA ALVAREZ et al., Interveners and Respondents.

## Counsel

Pacific Legal Foundation, Sharon L. Browne, Harold E. Johnson, Paul J. Beard II and Elizabeth A. Yi for Plaintiff and Appellant.

Baker & Hostetler and Peter W. James for Defendant and Respondent.

ACLU Foundation of Southern California, Catherine E. Lhamon, Mark D. Rosenbaum; NAACP Legal Defense and Educational Fund, Inc., Anurima Bhargava, Holly A. Thomas, Leticia Smith-Evans; Skadden, Arps, Slate, Meagher & Flom, Jason D. Russell, Stacy R. Horth-Neubert; Asian Pacific

American Legal Center, Julie A. Su; Hadsell & Stormer, Inc., Virginia Keeny, Anne K. Richardson; Mexican and American Legal Defense and Educational Fund, Cynthia Valenzuela; Hernan D. Vera and Laura F. Faer for Interveners and Respondents Ana Cecilia Alvarez, Darryl Anderson, Maria Cardenas, Coalition for Education Justice, Andrea Dietrich, Norma Echeagaray, Gwen Kenneally, Stephanie Kerley-Schwartz, Dorothea Logan, Simon Maskell, Mara Jean Ziegler and Peter Nathan Ziegler.

Winifred Kao; Scheff, Washington & Driver, Shanta Driver and George B. Washington for Interveners and Respondents Minerva Almaraz, Felisa Argueta, Henderson Thomas, Susan Yamasaki, Barbara Greenfield, United For Equality and Affirmative Action Legal Defense Fund, Coalition to Defend Affirmative Action, Integration & Immigrant Rights and Fight for Equality by Any Means Necessary.

## OPINION

**KRIEGLER, J.**—The issue presented in this appeal is whether the "Magnet" and "Permit with Transportation" (PWT) programs of defendant Los Angeles Unified School District (the District) violate Proposition 209 (Cal. Const., art. I, § 31, eff. Nov. 6, 1996) because the programs take into account a student's race or ethnicity in determining admission. Proposition 209 prohibits favorable or discriminatory consideration of race or ethnicity in public education, but expressly exempts from its reach court-ordered integration plans in existence prior to its effective date. We hold the trial court correctly ruled the District's Magnet and PWT programs are exempt from the prohibition in Proposition 209 because they were part of an existing court-ordered integration plan approved and implemented in 1981.

### BACKGROUND AND PROCEDURAL HISTORY

Following nearly two decades of litigation, the superior court entered a final order on September 10, 1981, approving with modification an integration plan in *Crawford v. Board of Education* (Super. Ct. L.A. County, 1981, No. 822854).[1] The plan of the District included provisions for Magnet schools and PWT programs, both of which took into account the race or ethnicity of the student in the application and admission process. In its final order, the superior court terminated its supervision over the case, except for the issue of attorney fees.

---

[1] The order was entitled, "ORDER RE FINAL APPROVAL OF SCHOOL BOARD DESEGREGATION PLAN AND DISCHARGE OF WRIT OF MANDATE."

In 1996, the voters of California approved Proposition 209,[2] which in part prohibits discrimination against or preferential treatment in favor of any individual or group on the basis of race, ethnicity, or national origin in the operation of public education. Proposition 209 included the following exception, found in article I, section 31, subdivision (d) of the California Constitution: "Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section."

The Magnet program is a voluntary integration program providing unique educational opportunities to students from kindergarten to 12th grade. The Magnet schools are part of the District's voluntary desegregation program. As of 2007–2008, the District operated 162 Magnet programs. Some Magnet programs are located on regular campuses, while others occupy entire school sites. Only gifted/high ability and highly gifted Magnet programs have specific eligibility requirements.

Admission to a Magnet school is based on a priority point system. Twelve priority points are earned for students who have completed one level in a Magnet school and apply to continue in the Magnet program at the next level. Between four and 12 points are awarded to applicants who have been on a Magnet waiting list, with the number of points determined by the length of time on the list. Students whose schools are designated as "Predominately Hispanic, Black, Asian, and Other Non-Anglo" (PHBAO) receive four points.

---

[2] Proposition 209 enacted California Constitution, article I, section 31, which provides as follows: "(a) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

"(b) This section shall apply only to action taken after the section's effective date.

"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.

"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.

"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.

"(f) For the purposes of this section, 'state' shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the state.

"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.

"(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section."

Four points are also awarded to students whose schools are deemed over-crowded. A student whose sibling attends the same Magnet to which application is made is given three points.

Maintaining ethnic balance is a factor in determining available space or openings in a Magnet program. Admission is determined using a formula of 60 percent PHBAO and 40 percent "Other White," although some Magnet programs use a 70/30 percent ratio. If a student of the required ethnicity is on the waiting list, the first available opening must go to that student in order to maintain racial or ethnic balance in the Magnet school. Ethnicity may affect the timing of admission to a Magnet program and whether a student gets into a first-choice school.

The PWT program is a voluntary integration plan available to students who live within a PWT sending school area. The PWT provides integrated educational experiences by placing PHBAO students in integrated settings, while providing opportunities for Other White students to attend PHBAO schools. PWT sending schools are PHBAO; PWT receiving schools are predominately White. Free transportation is provided only to students from sending schools. Assignments are made in order to improve the racial balance at the receiving school.

When applying for the Magnet or PWT programs, students must mark on the application one of seven federally identified racial or ethnic categories: American Indian; Asian; Black/African-American, not of Hispanic origin; Hispanic; White; Filipino; and Asian Islander. According to the application, "Your application WILL NOT be processed unless an ethnicity (1-7) is indicated." There is a provision for indicating the applicant is "Multi-racial/Multi-ethnic," but unless one of the seven federally recognized ethnic or racial categories is marked, the application will not be processed.

*Allegations of the Complaint*

On October 12, 2005, plaintiff and appellant American Civil Rights Foundation (ACRF) filed a verified complaint against the District for declaratory and injunctive relief, alleging the racial considerations in the Magnet School and PWT programs violate Proposition 209 to the extent the District's programs use race or ethnicity to select students. The complaint alleged Proposition 209, passed in November 1996, specifically prohibits racial or ethnic preferences in public education, and there was no existing court order prior to November 1996 mandating the District to use race or ethnicity in

selecting students for the Magnet or PWT programs. The order terminating jurisdiction in *Crawford v. Board of Education*, entered September 10, 1981, neither mandated nor authorized the District to use race or ethnicity in the selection of students to the programs.

The complaint alleged the details of the application and admission process for the Magnet and PWT programs, essentially as described above. ACRF sought a declaration that the programs impermissibly use race or ethnicity as a basis for discrimination against or preferential treatment to individuals or groups in public education. ACRF sought injunctive relief barring the District from enforcing the programs insofar as they require the use of race or ethnicity in the selection of students for the programs.

*The District's Answer and the Interveners*

The District answered that it was required to engage in each act complained of by *Crawford v. Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28]. Proposition 209, by its terms, is not applicable to the District's court-ordered desegregation plan, as the Magnet and PWT programs were created pursuant to a state court order that was acknowledged and approved by the United States Supreme Court (*Crawford v. Los Angeles Board of Education* (1982) 458 U.S. 527 [73 L.Ed.2d 948, 102 S.Ct. 3211]), and was in place on the effective date of the constitutional amendment.

Two complaints in intervention were filed by multiple parties, denominated the "Alvarez interveners" consisting of parents with students in the District's Magnet schools, and the "Almaraz interveners" consisting of parents of five students in the District and two organizations. Both interveners opposed ACRF's action.

*The Summary Judgment Motions*

All parties filed motions for summary judgment. The motion of ACRF was denied, but the District's motion for summary judgment was granted. Upon granting the District's motion, the motions for summary judgment filed by the Alvarez and Almaraz interveners were deemed moot. Only the District's successful summary judgment motion is at issue in this appeal.[3]

*The District's Summary Judgment Motion and ACRF'S Opposition*

The District moved for summary judgment on the basis that the Magnet and PWT programs were part of court orders or decrees in force as of the

---

[3] ACRF appeals from the judgment entered on January 22, 2008, in favor of the District. The parties stipulated that judgment be entered in favor of the District pursuant to the trial court's December 10, 2007 ruling on submitted matters on cross-motions for summary judgment.

effective date of Proposition 209 on November 6, 1996. The District argued it was required by court order to implement the programs on November 6, 1996. The District remained under court order after the trial court terminated supervision over the desegregation plan, even though that termination occurred many years earlier. The District relied upon *Board of Education v. Superior Court* (1998) 61 Cal.App.4th 411 [71 Cal.Rptr.2d 562] (*Carlin*) for the proposition that desegregation orders do not terminate merely because a court ended supervision of plan implementation. The District received reimbursement from the state for the cost of the programs from 1981 through 2000, indicating the programs are considered to be components of the court-ordered desegregation plan. The state's continued audits and reimbursement of the District's desegregation costs are evidence that the *Crawford* order remained in effect past November 6, 1996. The Legislative Analyst recognized that Proposition 209 would not impact court-ordered desegregation plans, and the voters approved Proposition 209 with that understanding.

In its opposition to the District's motion for summary judgment, ACRF disputed the District's characterization of the 1981 final order. ACRF disputed that the order mandated the Magnet and PWT programs or required the District to use race as a selection criterion. Moreover, Judge Robert Lopez ordered the writ discharged and vacated all outstanding orders.

ACRF did not dispute that Judge Lopez's 1981 *Crawford* order has never been reversed, overruled, vacated, revoked, modified, or withdrawn by any court. It did contend "the *Crawford* order itself discharged the writ and terminated the Court's jurisdiction over the Defendant's integration efforts." ACRF disputed that costs of the Magnet and PWT programs were reimbursed by the state for court-ordered and voluntary integration, as the *Crawford* order contained no mandate for the programs to rely on race.

*Relevant Undisputed Material Facts*

    A.   *The* Crawford *Action*

In 1970, Judge Alfred Gitelson issued a writ of mandate after finding the District operated impermissibly segregated schools. Although the California Supreme Court disagreed in part with Judge Gitelson's reasoning, it affirmed the judgment as modified. (*Crawford v. Board of Education, supra,* 17 Cal.3d 280.) The Supreme Court ordered the District to take "reasonable and feasible" steps to alleviate the harms of segregation regardless of the cause and to demonstrate meaningful progress in the task. (*Id.* at p. 306.)

B. *The District's Plan upon Remand from the California Supreme Court*

In 1977, the District submitted its integration plan. In 1978, Judge Paul Egly issued orders requiring "large-scale mandatory reassignment of pupils on a racial and ethnic basis." (*Crawford v. Board of Education* (1980) 113 Cal.App.3d 633, 636 [170 Cal.Rptr. 495].) In 1979, the voters approved Proposition 1 (Cal. Const., art. I, § 7, subd. (a)), eliminating the state court's power to order mandatory reassignment of pupils based on race unless required by the United States Constitution. (*Crawford v. Board of Education, supra,* 113 Cal.App.3d at pp. 636–637.) Although Judge Egly modified the 1978 order in 1980, the modified order "required substantial mandatory reassignment and transportation of pupils in the District." (*Id.* at p. 637.) On appeal, Judge Egly's 1980 orders were reversed in light of Proposition 1. (*Crawford,* 113 Cal.App.3d at pp. 638–657.) The United States Supreme Court affirmed. (*Crawford v. Los Angeles Board of Education, supra,* 458 U.S. 527.)

C. *The District's Integration Plan upon Remand from the United States Supreme Court*

The District submitted its plan for desegregation on June 30, 1981. The plan was framed in terms of the 1981–1982 school year, but "it is intended to be a continuing master plan" subject to adjustments necessary to meets its goals. To meet its goals of maximum desegregation, preservation of schools and neighborhoods that have achieved desegregation, and alleviation of the harmful effects of segregation, the plan utilized several components, including the Magnet and PWT programs.

Magnet programs were an integral part of the District's desegregation program. The program grew from six schools in 1977 to 86 schools and centers by September 1981, with more than 15,000 students enrolled and plans to increase enrollment. Priority is given to minority students presently attending overcrowded schools.

The District's 1981–1982 Choices booklet describes the Magnet schools and PWT programs. All students may apply, but school assignments are made only on the basis of improving the ethnic balance of the school to which the student is transferring. "For 1981–1982, virtually every school in the District with a White enrollment in excess of 40–50 [percent] will be a designated

PWT receiving school, and it is planned that as many as 18,000 to 20,000 minority students will participate." The assumption was that PWT would continue to be a viable part of the District's integration plan, which will provide ethnic balance at the receiving school and an integrated education for the participating minority student.

Whenever possible, the District will encourage voluntary programs including Magnet and PWT programs involving the reassignment of students to under-crowded facilities, and "[m]inority students attending overcrowded schools will continue to receive priority for admission."

### D. *The Superior Court's 1981 Order*

In an order dated September 1, 1981, Judge Lopez noted that 18 years had passed since the filing of the *Crawford* litigation in 1963. All the facts material to the case had changed. With the passage of time, the nomenclature had become outdated, misleading, and harmful to innocent children. Educational quality had been displaced as the prime focus of public education. The court found there must be a commitment to excellence in education to fulfill the expectations of all children in the District.

Determining that the case must be resolved and there must be finality in the law, the superior court found that it was time for common sense to return to the treatment of desegregation in the schools. The framework of the law was provided by the decisions of the California Supreme Court and Court of Appeal in *Crawford*. Those decisions required the District to develop a plan using reasonably feasible steps to produce meaningful progress in light of present conditions, regardless of the cause of segregation.

Regarding the District's submitted desegregation plan, the superior court made the following orders: (1) the District may construct new schools and make additions to existing ones to meet overcrowding and other needs; (2) the definition of groups in the plan as "minority" (PHBAO) was to end forthwith, as the term is factually inaccurate because those students comprise the vast majority of the school population, the label is harmful, the District had a duty to use factual descriptions, and those students should be referred to with accurate descriptions. The term "Racially Isolated Minority Schools" (RIMS) was barred as it is deceptive, demeaning, and inaccurate and should be replaced with a neutral term, but not "minority"; (3) all new elementary and junior high Magnet schools and programs "established under this plan"

shall be located in areas of PHBAO enrollment; (4) pupil-teacher ratios must be maintained at 27 to 1 or less in PHBAO schools; (5) all PHBAO pupils who volunteer are entitled to access all programs involving the voluntary transfer of students; (6) the District is to publicize transfer options to pupils in areas where most PHBAO families reside; (7) the District must issue annual reports on educational conditions and achievements in PHBAO schools; (8) the share of desegregation expenditures allocated to payment of administrative expenses shall not exceed the administrative expense ratio characteristic of the District's overall budget; and (9) the District shall prepare and make public, before July 15, 1983, a report of the measures taken and results achieved under the plan.

The superior court found that the District's plan, as modified by the court, would protect the rights of students and meet constitutional standards. It was time to end the litigation. The mandate to the District to take reasonably feasible steps to desegregate was clear. The District remained subject to its constitutional duty to take reasonable steps to alleviate school segregation, regardless of the cause. The District had satisfied the mandate of the court, and the writ was ordered discharged. "All outstanding Orders of the Superior Court in this matter, save the Minute Orders re Court Monitors, are vacated, effective this date. The Court retains jurisdiction for the sole purpose of determining the matter of attorneys' fees." The District's plan included the continuation of voluntary desegregation programs including Magnet and PWT programs.

### E. *Additional Evidence in Support of Summary Judgment*

Peter W. James, principal counsel for the District in this action, has represented the District in desegregation matters since the summer of 1979. He was senior trial counsel for the District in the remedy hearing in *Crawford*, conducted before Judge Egly between October 1979 and May 1980. Judge Egly believed mandatory busing was necessary and ordered the District to implement a complex multiethnic mandatory busing plan. Judge Egly's order was vacated in *Crawford v. Board of Education, supra,* 113 Cal.App.3d 633. Review was denied by the California Supreme Court, but certiorari was granted by the United States Supreme Court, which affirmed the judgment of the Court of Appeal.

James declared that although the Court of Appeal vacated Judge Egly's order as to the type of remedy, it did not remove the District's obligation under *Crawford v. Board of Education, supra,* 17 Cal.3d 280, to formulate a desegregation plan. The District formulated a desegregation plan dated June

30, 1981. Judge Lopez vacated an interim order of the court and modified the District's desegregation plan. Judge Lopez ordered the plan implemented and provided for an end to active court supervision in 1981, except for the purpose of determining attorney fees.

James declared that to meet the costs of the desegregation, the Legislature in 1978 enacted Education Code former section 42243.6 to provide state reimbursement of mandated costs, including court-ordered desegregation plans. The District sought and received reimbursement from the state under this provision from 1979 until 2000, when it was replaced with other funding. Before 2001, the Legislature also reimbursed school districts for voluntary desegregation costs, but at a lower rate, pursuant to Education Code former section 42247.

James further declared there was an audit of the District's reimbursement request to the state for 1995-1996. The District obtained clearance in advance from the State Controller before making any changes in its desegregation plan to avoid denial of reimbursement costs under Education Code former section 42243.6. The District was assured that proposed changes to class size, mandated by legislation, would not jeopardize reimbursement for the District's court-ordered desegregation costs. State Controller Kathleen Connell wrote in a letter dated September 10, 1996, that the District's desegregation plan was court-ordered and mandated costs were reimbursable.

Olonzo Woodfin III, the former controller and chief financial officer of the District, filed a declaration stating he was responsible for preparing and filing claims for reimbursement of court-mandated desegregation costs under Education Code former sections 42243.6 and 42247. He was responsible for the request for reimbursement of desegregation expenses for the 1995–1996 school year, the last year before Proposition 209 was approved. The request for reimbursement was for more than $329 million in court-ordered expenses and $62 million in voluntary desegregation expenses. From 1981 through 2000, the District requested and received state reimbursement for costs under the *Crawford* order. After a formal audit by the State Controller for 1995–1996, the state paid the District $327 million of the $329 million claimed for a "court-ordered desegregation program" under Education Code former sections 42243.6 and 42247. In 1996–1997, the state paid $330 million on a request of $327 million in court-ordered desegregation costs.

Gary Orfield, an expert in desegregation cases, declared that he was a court-appointed expert in *Crawford*. In his experience, it is highly unusual for a court-ordered desegregation plan to have an expiration date. Generally a desegregation plan remains in place until a party to the case or other interested person with standing applies to the court for the plan's termination.

It is not unusual for a plan to remain in effect for several decades. Short-term desegregation would leave the underlying patterns largely unchanged and the plans must be continued until they become part of the accepted structure of the school district and its community.

Orfield further declared he did not believe the superior court intended the *Crawford* desegregation plan would remain in effect for only two years (until the date of the court-ordered 1983 status report). No such discussion took place and he was unaware of anyone else involved in the *Crawford* litigation who believed the plan would be implemented for such a short period of time. It would be absurd and destructive to send children to another school for a brief period of time and then send them back to an inferior, segregated school. The types of changes necessary to achieve successful desegregation in a jurisdiction like Los Angeles cannot be achieved quickly because of the need to create educational benefits that justify commuting to another school.

The Legislative Analyst's assessment of Proposition 209 contained in the ballot pamphlet for the November 5, 1996 General Election indicated that elimination of voluntary desegregation programs might affect up to $60 million in voluntary desegregation expenses. Court-ordered expenses would not be affected by the proposition.

F. *The Trial Court's Ruling on the District's Summary Judgment Motion*

The trial court found that Judge Lopez's 1981 final order and the plan Judge Lopez ordered implemented followed the pattern of virtually all remedy orders in desegregation cases "and used race expressly." The 1981 order has never been reversed, overruled, vacated, revoked, modified, or withdrawn, and ACRF does not contend otherwise. Contrary to ACRF's claim, the superior court found it clear and beyond dispute that the District was ordered to employ race and ethnicity to ensure that the Magnet schools would in fact be integrated. The trial court's 1981 remedy, which included race-based selection for Magnet schools and PWT programs, ordered implementation of the plan as submitted, subject to exceptions set forth by the court. ACRF did not contend that Proposition 209 eliminated the state's constitutional obligation that districts take reasonably feasible steps to alleviate school segregation, regardless of its cause.

The 1981 *Crawford* remedy order was in existence on November 6, 1996, when Proposition 209 became effective. Judge Lopez required the District to show progress by report in two years, but did not state that he expected the goals to be achieved in that time, and given the size of the District and patterns of segregated housing, achievement did not seem eminent. Annual

reports were ordered on educational conditions and achievements of PHBAO schools, indicating the court's expectation that the order would remain in effect for the foreseeable future.

Citing *Carlin, supra*, 61 Cal.App.4th at page 414, the superior court ruled that the end of supervision of a desegregation plan does not terminate a district's integration program. Instead, responsibility is returned to the District. Without an explicit order of termination, it is presumed the order is binding and remains in force. Because the *Crawford* order has never been reversed, overruled, vacated, revoked, modified, or withdrawn, and has never expired, it was in effect when Proposition 209 became effective. Due to the existing 1981 order, Proposition 209 did not bar the Magnet and PWT programs as they continue to operate.

The District's motion for summary judgment was granted. Objections by ACRF to the separate statement were overruled.[4] The other motions for summary judgment were all rendered moot as a result of the summary judgment ruling.

## DISCUSSION

ACRF argues that the Magnet and PWT programs are facially unconstitutional under Proposition 209 to the extent they include race as a basis for admission. ACRF renews the argument made in the trial court that the 1981 order issued by Judge Lopez terminated the superior court's jurisdiction, so there was no existing desegregation order at the time Proposition 209 was approved in 1996.

*Standard of Review*

"We review an order granting summary judgment de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) However, any determination underlying the order granting summary judgment is reviewed under the standard appropriate to that determination. (*Id.* at p. 859.)" (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467 [71 Cal.Rptr.3d 707].) The interpretation of the 1981 final order of the superior court is an issue of law subject to de novo review.

"As well, issues of statutory and constitutional interpretation raise pure questions of law, subject to independent appellate review. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d

---

[4] These objections are not asserted on appeal.

10].)" (*Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 974 [36 Cal.Rptr.3d 627].) " 'A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words.' " (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 559 [101 Cal.Rptr.2d 653, 12 P.3d 1068].)

*Application of Proposition 209 to Voluntary Integration Plans*

ACRF argues Proposition 209 applies to a voluntary integration plan implemented by a school district to achieve racial balance, citing *Crawford v. Huntington Beach Union High School Dist.* (2002) 98 Cal.App.4th 1275 [121 Cal.Rptr.2d 96] (*Huntington Beach*). We agree, although that issue is not determinative in this case.

In *Huntington Beach*, the plaintiff contended a school district's open-transfer policy with a "racial and ethnic" balance component violated Proposition 209. (*Huntington Beach, supra*, 98 Cal.App.4th at p. 1277.) The policy was explained as follows: "To prevent an 'inappropriate' racial and ethnic balance, the District restricts transfers to and from Westminster High School. If you are White and you live inside the high school's attendance area, you cannot transfer out unless another White student is willing to transfer in and take your place. If you are non-White and you live outside the high school's attendance area, you cannot transfer in unless another non-White student is willing to transfer out and you take that student's place." (*Id.* at p. 1278.)

The court held that the transfer program violated the express terms of Proposition 209 in that it is impermissible to discriminate against, or grant preferential treatment to, any individual or group on the basis of race or ethnicity in the operation of public education. (*Huntington Beach, supra*, 98 Cal.App.4th at pp. 1286–1287; see also *Hi-Voltage Wire Works, Inc. v. City of San Jose, supra*, 24 Cal.4th at p. 562 [city's outreach program on behalf of women and minority business enterprises discriminated against or gave preferential treatment on the basis of gender or race, in violation of a parallel provision of Prop. 209]; *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 47–63 [112 Cal.Rptr.2d 5] [five state government affirmative action programs violated Prop. 209 to the extent public contracts, civil service positions, and promotions were available to groups on the basis of race or gender].)

We have no occasion to question the sound reasoning of *Huntington Beach*. But the opinion did not address the exemption from Proposition 209 for existing court orders in place on the provision's effective date. Cases are not authority for issues not in dispute. (*McDowell & Craig v. City of Santa Fe*

*Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344].) We therefore turn to the application of the exemption for existing court-ordered desegregation plans.

*Interpretation of the 1981 Final Order*

ACRF argues that because the superior court in 1981 discharged the previously issued mandate and terminated jurisdiction, there was no existing order requiring the District to rely upon race or ethnicity at the time Proposition 209 was approved in 1996. The portion of the 1981 order relied upon by ACRF is as follows: "The Court finds that respondent Board of Education has satisfied the mandate of the Court issued May 19, 1970, interpreted in light of the opinions expressed by the Supreme Court in *Crawford v. Board of Education* (Crawford I), *supra*, and Court of Appeal in *Crawford v. Board of Education* (Crawford II), *supra*, and each of them, and, so finding, orders the writ discharged. [¶] All outstanding Orders of the Superior Court in this matter, save the Minute Orders re Court Monitors, are vacated, effective this date. The Court retains jurisdiction for the sole purpose of determining the matter of attorney fees."

We disagree with ACRF's interpretation of the above quoted passage as indicating the superior court eliminated court-ordered desegregation in 1981. To the contrary, the superior court expressly approved the District's integration plan with modifications, finding "that the Plan, as ordered changed by the Court, will protect the rights of all students and meet Constitutional standards." As discussed more fully below, the superior court's final order required the District to take steps to alleviate segregation in accordance with the District's plan, as modified, and ended the court's supervision over implementation.

We begin our analysis with the undisputed material fact that the superior court's 1981 final order has never been reversed, overruled, vacated, revoked, modified, or withdrawn. There are available means to modify or set aside an existing desegregation order directed to a school district. (See *Carlin, supra,* 61 Cal.App.4th at pp. 417–418 [superior court vacated earlier desegregation order and accelerated the end of court supervision of its desegregation program].) As the *Carlin* court observed, "[t]he effect of terminating supervision is not to end District's integration program but to end the court's involvement in this particular case. Having supervised this case for over 20 years and gained great familiarity with the parties and issues, the court concluded District did not require court supervision to assure it complied with all constitutional obligations. The court was also mindful the ultimate goal was to return to local control, and if future actions warranted involvement, its jurisdiction could be invoked again. In 1995, the court observed

ending supervision 'doesn't especially mean that the court is not available if [District] engages in activities that warrants [*sic*] a new writ of mandate. That is why we are here.' " (*Id.* at p. 420.)

■ As the United States Supreme Court has made clear, a school district is entitled to rely on the ongoing validity of a desegregation order, in the absence of a clear directive from the court that the district is no longer subject to the order. "In *Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424 [49 L.Ed.2d 599, 96 S.Ct. 2697] (1976), we held that a school board is entitled to a rather precise statement of its obligations under a desegregation decree. If such a decree is to be terminated or dissolved, respondents as well as the school board are entitled to a like statement from the court." (*Board of Ed. of Oklahoma City v. Dowell* (1991) 498 U.S. 237, 246 [112 L.Ed.2d 715, 111 S.Ct. 630].) At no time has the superior court indicated to the District that the 1981 order was terminated.

ACRF argues that once the 1981 order terminated superior court supervision of the desegregation plan, any continued use of race could only be justified on some other basis, citing *Parents Involved in Community Schools v. Seattle School Dist No. 1* (2007) 551 U.S. 701 [168 L.Ed.2d 508, 127 S.Ct. 2738]. *Parents Involved* is easily distinguished. The district court in *Parents Involved* had issued a 1975 desegregation order, but in 2000 entered a decree dissolving the order with a "finding that Jefferson County had 'eliminated the vestiges associated with the former policy of segregation and its pernicious effects,' and thus had achieved 'unitary' status." (*Id.* at pp. 720–721 [127 S.Ct. at p. 2752].) "Once Jefferson County achieved unitary status, it had remedied the constitutional wrong that allowed race-based assignments." (*Id.* at p. 721 [127 S.Ct. at p. 2752].) No similar order exists in this case. The superior court in its 1981 final order did not find that the attributes of segregation had been eliminated. To the contrary, it approved a forward-looking plan, with specific modifications, designed to ameliorate the effects of segregation.

It is difficult to accept ACRF's argument that the District was not under a court-ordered integration plan in 1996 when Proposition 209 was approved, considering that the 1981 order was replete with elements to be implemented, including operation of the Magnet and PWT programs as defined in the District's desegregation plan. The modifications to the plan imposed by the superior court commanded how the District was to describe the ethnicity of students, limited the location of new Magnet schools, set a minimum for teacher-student ratios that were to be maintained, mandated access to voluntary transfer programs by all PHBAO pupils who volunteer to participate, required publicity to disseminate information on the transfer options, ordered annual reports on educational conditions in PHBAO schools, placed limits on the share of desegregation expenses, and imposed a requirement on the

District to report before July 15, 1983, on the measures taken and results achieved under the plan. These components of the superior court's 1981 order are manifestly inconsistent with the notion that the District did not remain under a court-ordered desegregation plan.

ACRF argues the 1981 order did not mandate the District to use race as a criterion for selection of students in the Magnet and PWT programs. As the superior court properly found in granting summary judgment, the order was a desegregation order, which orders typically apply racial considerations. The plan, as approved, included the Magnet and PWT programs, which were expressly designed to provide racial balance in the schools, and approved by the superior court on that basis. The 1981 final order did require the District to consider race in these programs in order for the District to fulfill its desegregation obligation.

Additional uncontroverted evidence presented by the District in support of its motion for summary judgment is consistent with the trial court's ruling that the 1981 order remained in place as of the effective date of Proposition 209. Orfield, the court-appointed desegregation expert in *Crawford*, explained that court-ordered desegregation plans usually do not have an expiration date, can be in effect for decades, and remain in place until a person with standing applies for termination. There was no discussion that the plan in *Crawford* would remain in place for only two years (apparently until the July 1983 report on progress), because it would have been absurd to end the program so quickly and return students to segregated schools, and the types of changes needed in a jurisdiction like Los Angeles cannot be achieved quickly.

The State Controller treated the District's plan as a court-mandated integration plan, reimbursing the District in excess of $300 million in the 1995–1996 and 1996–1997 school years under Education Code former sections 42243.6 and 42247. From 1981 through 2000, the District received reimbursement for costs under the *Crawford* order under these statutes.

The Legislative Analyst explained in the ballot pamphlet that if Proposition 209 was approved, there would be a reduction of up to $60 million in voluntary desegregation costs, but that court-ordered expenses would not be affected.

■ Based on the above uncontroverted evidence, we hold the 1981 final order remained in effect at the time of the passage of Proposition 209. That order encompassed implementation of the District plan, which included the voluntary Magnet and PWT programs, and the racial preferences they invoke. In that the 1981 order has never been reversed, vacated, or overruled, it remains in effect, and the programs fall beyond the reach of Proposition 209.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent Los Angeles Unified School District.

Turner, P. J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 11, 2009, S170131.