[No. A124263. First Dist., Div. One. Mar. 25, 2010.]

Estate of EUGENE WINANS, Deceased.
MARK WINANS et al., Contestants and Appellants, v.
ELIZABETH TIMAR, Claimant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B. and II.C.

104

COUNSEL

Anderson, Zeigler, Disharoon, Gallagher & Gray and Daniel E. Post for Contestants and Appellants.

Shapiro, Galvin, Shapiro & Moran and Adrienne M. Moran for Claimant and Respondent.

OPINION

MARGULIES, J.—In 2005 and 2006, Eugene Winans (Winans) executed wills excluding his half brother and leaving most or all of his property to appellants, Winans's nieces and nephews by a different brother. Barely one month before his death in 2007, using a different attorney, Winans executed a new will that differed considerably by including his half brother, excluding appellants, and leaving substantial property to his care custodian, respondent Elizabeth Timar, and other nonrelatives who were not beneficiaries in the prior wills. Appellants challenged the validity of the new will on the grounds of undue influence by Timar and lack of testamentary capacity. They also challenged with respect to the bequest to Timar the validity of the certificate of independent review obtained by Winans under Probate Code[1] section 21351. After substantial discovery by the parties, the trial court granted summary judgment in favor of Timar, dismissing appellants' will contest.

Appellants contend triable issues of fact exist precluding summary judgment. Regarding the certificate of independent review, appellants contend the certifying attorney (1) failed properly to counsel Winans with respect to the "nature and consequences" of the bequest to Timar because he did not explain the statutory scheme under section 21350 and spent only a brief time in counseling, (2) did not conduct the counseling in a confidential manner because others were in the room at the time the counseling occurred, and (3) could not be considered an "independent" attorney because he was designated as executor in the will and stood to earn a substantial fee if appointed. We agree with appellants, finding triable issues of fact as to the substantive adequacy of counseling, the certifying attorney's independence, and the confidentiality of the counseling session. In addition, we find triable issues of fact with respect to Timar's alleged undue influence and Winans's testamentary capacity. Accordingly, we reverse the trial court's grant of summary judgment.

[1] All statutory references are to the Probate Code unless otherwise indicated.

## I. BACKGROUND

Beginning in late 2003, Winans, then 89 or 90 years old, lived in the Canterbury Home (Canterbury), a six-bed residential care facility in Santa Rosa, owned and operated by Timar. As early as 2004, Winans began suffering significant memory loss, diagnosed by his physician as "chronic dementia." Winans was in Canterbury in part because his poor memory prevented him from caring for himself, including paying bills and remembering to take medicine. As a result, Winans relied on others, often including Timar, to "fill in gaps of information." Winans was also susceptible to depression and suicidal thoughts when not treated with antidepressant medication.

In her position as head of the small care facility, Timar and her staff had more contact with Winans than anyone else during the last years of his life. In addition to caring for his physical needs, Timar made bank deposits for Winans and helped him pay bills by writing out checks for his signature. Winans's holdings were substantial; he owned several rental properties in Northern California, worth over $4 million at his death.

Winans had two sets of legal heirs: his half brother Norman Winans, who had three children, and appellants Mark Winans, Dianne Paolucci, and Phyllis Burton, the three children of another brother, Byron Winans, who died in 1999.[2] Appellants had not seen Winans since before Byron Winans's death in 1999 and had little or no knowledge of his personal circumstances during the last years of his life.

On May 5, 2005, Winans executed a will (2005 will) leaving a residence he owned in Forestville (Forestville property) to Susan Hirshfield and Arthur Hughes, who were then tenants in the home, and appointing them executors of his estate. In addition to being Winans's tenant, Hirshfield was his frequent visitor at Canterbury. The 2005 will required the remainder of Winans's property to be distributed by the laws of intestate succession, but Norman Winans and his children were specifically excluded for reasons the record does not make clear. As a result, appellants would have received the entirety of the very substantial residue.

Since 2004, Timar and others had been concerned that Hirshfield and Hughes were attempting to take advantage of Winans. In a form filed that

---

[2] Although the record is somewhat unclear, Norman Winans was apparently alive during this time, since appellants' will contest listed him as a living heir. Winans had two other brothers, but they appear to have died many years before without leaving heirs.

year with the ombudsman who oversaw Winans's care, Timar complained Hirshfield was visiting him frequently and attempting to persuade him to sell her the Forestville property at a reduced rate.[3] Whatever the truth of these suspicions, in August 2006, Winans told the ombudsman he wanted to change his will. A new will was executed on September 26, 2006 (2006 will), that deleted the bequest to Hirshfield and Hughes and substituted a "private fiduciary" for Hirshfield and Hughes as the executor. Because the will left intact the instructions for intestate distribution and the exclusion of Norman Winans and his children, appellants would have inherited the entirety of Winans's estate under the 2006 will.

In April 2007, Winans suffered a stroke. The next month, after he returned to Canterbury from the hospital, Timar asked the ombudsman to speak with Winans, who had become agitated after a recent visit from Hirshfield. When she met with Winans, the ombudsman found that his speech and thought were impaired, and he relied on Timar to help him articulate his thoughts. Winans's treating physician testified that by this time Winans was a very sick man, suffering from congestive heart failure, fluid in his lungs, and kidney failure.

During the meeting with the ombudsman when Winans expressed agitation about Hirshfield's activities, those present discussed whether he needed an attorney. When the ombudsman suggested contacting the attorney who had drafted Winans's wills, Timar told the ombudsman that attorney was tainted and said she knew another one. Later that month, Attorney Patrick Coyle was contacted on Winans's behalf, but it is unclear who selected Coyle to act as Winans's attorney. Despite her comment during the meeting, Timar claimed in a declaration she had no role in retaining Coyle. He was initially contacted by another attorney and the husband of Malinda Kozel, a tenant in a building Winans owned in San Francisco.

Regardless of the means by which he was selected, Coyle first met with Winans on May 31 at Canterbury. Winans told Coyle he thought he had signed a document giving away the Forestville property to Hirshfield and asked Coyle to investigate. Coyle found Winans to be alert and responding appropriately at this time. Although hard of hearing, he gave no signs of mental incompetence. After investigating and determining Winans had not given away the Forestville property, Coyle had another meeting with him. At that time, Winans told Coyle he had executed an earlier will leaving property to his brother Norman, but he destroyed it after a falling out.[4] Winans said he

---

[3] The ombudsman, Eileen Bill, acted as an advocate for residents and visited Canterbury perhaps once per month.

[4] If such a will existed, the record contains no evidence of it.

was uncertain whether Byron and Norman were still alive, but he recalled failing to attend the funeral of one of his four brothers. Winans said he had resolved not to leave any property to his brothers' children, who he believed were upset over his failure to attend that funeral. At some point, Coyle became aware Winans wanted to execute a will.

Based on Winans's statements, Coyle concluded Winans had destroyed his previous will. Coyle later asked Timar whether Winans had a will, and she answered she "didn't know," although there was evidence indicating she was aware of Winans's earlier wills. It was not until much later that Coyle learned of the 2005 and 2006 wills.

Under the impression Winans had no will, Coyle arranged for Ira Lowenthal, an attorney who shared office space with Coyle, to draft one. Coyle and Lowenthal met with Winans on June 8, 2007. Winans told the attorneys he wanted to leave the house in Forestville to Timar because she had taken care of him over the last few years. Winans also wanted to give bequests to a few longtime tenants in his other properties. During this meeting, Winans remained uncertain whether his brother Norman was alive, but he now recalled Byron's death, although he incorrectly placed it only the year before. He also recalled it was Byron's children, appellants, who ignored him because he was unable to attend their father's funeral and said he did not want to include them in the bequests for this reason.[5] Winans selected Coyle as his executor.

Following these discussions, Lowenthal drafted a will (2007 will) for Winans devising the Forestville property to Timar. The remaining beneficiaries, who divided the residue, were Norman Winans, Janice Hilpert, Malinda Kozel, and Raffie Vaknin, all tenants of Winans's properties, and Joan Schefer, a piano player at Canterbury with a "30 year plus history" with Winans. Expressly omitted from the 2007 will were Byron and appellants, thereby reversing the family bequests in the 2006 will executed less than a year earlier. The reason for the reversal as to Norman Winans is unclear. Because Coyle and Lowenthal were unaware of the earlier wills, they did not inquire about this change.

On June 11, Coyle and Lowenthal met with Winans at Canterbury for execution of the 2007 will. Also present was a notary public Lowenthal had brought to witness the signing. After Lowenthal read the terms of the will to

---

[5] When questioned at deposition, Mark Winans was baffled by the claim of bad feelings. He said it was true Winans did not attend Byron's funeral, but the family understood that Winans had health problems and held no grudge. Nonetheless, Mark Winans had no contact with Winans after his father's death.

Winans, Coyle counseled Winans pursuant to section 21351, informing Winans he was giving property to Timar, asking whether he had been pressured to give the bequest or whether any threats or promises had been made to obtain the bequest, and telling Winans if he had any "problems" with Timar he and Lowenthal could take care of them. Winans said his bequest was voluntary. This interaction took no more than one to five minutes. Coyle later prepared a certificate of independent review under the statute and sent it to Winans.

Based on his observations, which spanned approximately six meetings with Winans, Coyle saw no sign of mental deficits. At the time Coyle and Winans discussed a new will, Coyle testified, Winans was aware of his property, was generally aware of his family, knew what he wanted to do with his property, and had rational reasons for that disposition. Coyle concluded Winans was genuinely grateful to Timar for the care she had given him and saw no signs Timar had exercised any undue influence over Winans. Lowenthal reached similar conclusions during his conversations with Winans regarding the will.

Winans died on July 15, 2007, barely a month after executing the 2007 will. Soon after, Lowenthal filed a petition for probate of the will. In response, two will contests were filed, one by Hirshfield and Hughes and the other by appellants. Both will contest petitions alleged Winans lacked testamentary capacity when he executed the 2007 will and was subject to Timar's undue influence. Appellants' petition also alleged Timar was statutorily disqualified from receiving a bequest because she was a caregiver of Winans when the 2007 will was executed. Following substantial discovery, the probate court granted motions for summary judgment filed by Timar with respect to both will contests, holding the "evidence offered . . . [is] inadequate to raise any triable issues of material fact as to the validity of the Certificate, the existence of undue influence or the testamentary capacity of Eugene Winans; they only raise speculation and suspicion."[6]

## II. DISCUSSION

Appellants contend the trial court's grant of summary judgment was in error because there are triable issues of fact regarding whether the certificate of independent review executed by Coyle was valid, whether Timar had exercised undue influence in the preparation of the 2007 will, and whether Winans had testamentary capacity when he executed the will.

---

[6] The contest filed by Hirshfield and Hughes is not before us on this appeal.

" 'We review the grant of summary judgment de novo. [Citation.] We make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." ' " (*Stoltenberg v. Newman* (2009) 179 Cal.App.4th 287, 291–292 [101 Cal.Rptr.3d 606].)

## A. *Certificate of Independent Review*

■ Section 21350 precludes care custodians from being beneficiaries of testamentary transfers from dependent adults to whom they provide care services, as well as barring similar transfers to other "disqualified persons."[7] (§§ 21350, subd. (a)(6), 21350.5; see generally *Estate of Pryor* (2009) 177 Cal.App.4th 1466, 1471–1472 [99 Cal.Rptr.3d 895]; *Estate of Shinkle* (2002) 97 Cal.App.4th 990, 1002 [119 Cal.Rptr.2d 42], disapproved on other grounds in *Bernard v. Foley* (2006) 39 Cal.4th 794, 816 [47 Cal.Rptr.3d 248, 139 P.3d 1196].) Section 21351, however, contains an exception to the prohibition on gifts contained in section 21350 if "[t]he court determines, upon clear and convincing evidence, but not based solely upon the testimony of [the disqualified person], that the transfer was not the product of fraud, menace, duress, or undue influence." (§ 21351, subd. (d).) Accordingly, the bar of section 21350 is merely presumptive, albeit a presumption that must be rebutted with clear and convincing evidence. (See *Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 318 [21 Cal.Rptr.3d 246] (*Osornio*) ["This 'elevated proof burden' [citation] requires the proposed donee to 'persuade [the trier of fact] that it is highly probable that the fact is true.' "].)

■ The statutory bar of section 21350 supplements the preexisting common law doctrine that a presumption of undue influence arises when a person in a confidential relationship with the testator actively participates in procuring a will and benefits unduly under it. (*Rice v. Clark* (2002) 28 Cal.4th 89, 97 [120 Cal.Rptr.2d 522, 47 P.3d 300].) The statute's purpose, evident on its face, is "to prevent unscrupulous persons in fiduciary relationships from obtaining gifts from elderly persons through undue influence or other overbearing behavior." (*Bank of America v. Angel View Crippled Children's Foundation* (1999) 72 Cal.App.4th 451, 456 [85 Cal.Rptr.2d 117].) In enacting the statute, the Legislature sought to strike a balance between "protecting prospective transferors from fraud, menace, or undue influence, while still

---

[7] The other primary categories of disqualified persons are fiduciaries of the donor and persons involved in the drafting of the will. (§ 21350, subd. (a)(1), (4).) Timar does not dispute she is subject to the statute as a "care custodian" for purposes of section 21350.

ensuring the freedom of transferors to dispose of their estates as they desire and reward true 'good Samaritans.' " (Stats. 2006, ch. 215, § 1.)

■ The ban of section 21350 is also avoided if a "certificate of independent review" is prepared with respect to the transfer. (§ 21351, subd. (b).) Under this procedure, the transfer is reviewed by an "independent attorney," who must counsel the transferor about the "nature and consequences of the intended transfer" and "attempt[] to determine if the intended consequence is the result of fraud, menace, duress, or undue influence." The attorney must then prepare a certificate of independent review and deliver it to the transferor.[8] (§ 21351, subd. (b).) The certificate must read substantially as follows: " 'CERTIFICATE OF INDEPENDENT REVIEW [¶] I, [attorney's name], have reviewed [name of instrument] and counseled my client, [name of client], on the nature and consequences of the transfer, or transfers, of property to [name of potentially disqualified person] contained in the instrument. I am so disassociated from the interest of the transferee as to be in a position to advise my client independently, impartially, and confidentially as to the consequences of the transfer. On the basis of this counsel, I conclude that the transfer, or transfers, in the instrument that otherwise might be invalid under Section 21350 of the Probate Code are valid because the transfer, or transfers, are not the product of fraud, menace, duress, or undue influence.' " (*Ibid.*)

■ As the Supreme Court has noted, the certificate of independent review is "a clear pathway to avoiding section 21350," providing "transferors who so desire with a ready mechanism for making donative transfers to care custodians." (*Bernard v. Foley, supra,* 39 Cal.4th at pp. 814, 815.)

■ In construing these statutes, " ' " 'we strive to ascertain and effectuate the Legislature's intent.' " [Citations.] "Because statutory language 'generally provide[s] the most reliable indicator' of that intent [citations], we turn to the words themselves, giving them their 'usual and ordinary meanings' and construing them in context [citation]." [Citation.] If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.] If, however, the statutory language is susceptible of more than one reasonable construction, we can look to

---

[8] The relevant portion of section 21351 states: "Section 21350 does not apply if any of the following conditions are met: [¶] . . . [¶] (b) The instrument is reviewed by an independent attorney who (1) counsels the client (transferor) about the nature and consequences of the intended transfer, (2) attempts to determine if the intended consequence is the result of fraud, menace, duress, or undue influence, and (3) signs and delivers to the transferor an original certificate in substantially the following form, with a copy delivered to the drafter: [text of certificate]."

legislative history in aid of ascertaining legislative intent. [Citation.]' " (*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708–709 [61 Cal.Rptr.3d 689, 161 P.3d 198].) Issues of statutory interpretation raise pure questions of law, subject to independent appellate review. (*American Civil Rights Foundation v. Los Angeles Unified School Dist.* (2008) 169 Cal.App.4th 436, 448 [86 Cal.Rptr.3d 754].)

Appellants contend the trial court erred in finding the certificate valid because (1) Coyle's discussion with Winans of the transfer to Timar did not satisfy the substantive requirements for counseling under the statute, (2) Coyle's counseling was not confidential, and (3) Coyle was not an "independent" attorney, as required by the statute, because he stood to be appointed executor of the substantial estate under the 2007 will.

### 1. Adequacy of the Substance of Coyle's Counseling

As appellants acknowledge, section 21351 "does not discuss a minimum, adequate level of counseling" regarding a donative transfer to a disqualified person. Rather, subdivision (b) of section 21351 contains only the barest description of the necessary counseling. The text of the statute requires the attorney to "counsel[] the client (transferor) about the nature and consequences of the intended transfer." (*Ibid.*) The certificate language adds nothing to this requirement, stating only that the signatory "counseled my client . . . on the nature and consequences of the transfer, or transfers, of property." (*Ibid.*)

Coyle testified that, immediately prior to execution of the will, "I went through some questions about was [Winans] under any pressure. You are giving this to [Timar]. You don't have to do this. I told him if he had any problems that [Lowenthal] and I would take care of them; that he didn't have to do this. Had she, you know—or had there been any pressure? Was there any promises, any requests? All of which he said 'no.' And I did that before he signed the will."

Relying on *Osornio, supra,* 124 Cal.App.4th 304, appellants argue Coyle was also required to discuss with Winans the existence of the statute, its purpose and operation, and the concept of "disqualified persons." We find no support in the statutory language for this requirement. As noted above, the independent attorney's duty under the statute is to counsel the transferor about the "nature and consequences" of the gift—in essence, to make sure the transferor knows exactly what he or she is doing in executing the instrument. The transferor does not need to know about the existence of the statute or understand its workings in order to understand the nature of his or her bequest. In the absence of a requirement in the statute that the independent attorney discuss the statute with the transferor, we decline to impose one.

The requirement imposed in *Osornio* arose in an entirely different context. In that case, the defendant, an attorney, was retained to draft a will in which the testator left her entire estate to the plaintiff, a care custodian. In the process, the drafting attorney failed to obtain a certificate of independent review. When the care custodian was later unable to overcome the statutory presumption against the bequest, the bequest failed. The care custodian sued the attorney, contending the failure of the bequest was the result of his negligence in failing to obtain a section 21351 certificate. (*Osornio, supra*, 124 Cal.App.4th at pp. 313–315.) In addressing the duty owed by the drafting attorney to the client, the court held, "the attorney owes a duty of care: (1) to advise the client that, absent steps taken under section 21351[, subdivision ](b), the subject transfer to the proposed transferee, if challenged, will have a significant likelihood of failing because of the proposed transferee's presumptive disqualification under section 21350[, subdivision ](a); and (2) to recommend that the client seek independent counsel in an effort to obtain a certificate of independent review provided under section 21351[, subdivision ](b)." (*Id.* at p. 334.)

As is clear from this quotation, the counseling required by *Osornio* is intended to occur prior to the client's decision to obtain a certificate of independent review. The statute must be discussed with the client at this time in order to ensure he or she is aware of the option of obtaining a certificate and the consequences that could follow from the failure to obtain one. That type of advice was irrelevant here, since a decision had already been made to obtain a certificate when Coyle's counseling occurred. Discussing the statute with him for the reasons important in *Osornio* would have been superfluous. Further, it is clear *Osornio* was not purporting to interpret the counseling requirement of section 21351, subdivision (b) in reaching its holding. Rather, the ruling concerned the requirements for counseling regarding *the decision to obtain* a section 21351 certificate. As a result, *Osornio* provides no basis for imposing the requirement proposed by appellants.

■ Nonetheless, we conclude a triable issue of fact existed as to the adequacy of the substance of Coyle's counseling. The term "nature and consequences" of the bequest must be construed in light of the purpose of the statute to ensure that testators who make bequests to disqualified persons do so voluntarily and in full awareness of the scope of their acts. In these circumstances, the "nature" of the bequest is fairly straightforward, referring to the type and amount of property being transferred. The "consequences" of the bequest, however, are more complex. Each bequest of property governed by section 21350 is both a transfer of property to a disqualified person and denial of property to others whom the law regards as the more likely objects of the testator's bounty. Section 21350 was intended to ensure that persons who are the natural objects of a testator's bounty are not excluded inadvertently or improperly in favor of a disqualified person. Accordingly, the

"consequences" of a bequest refers to not only, as Coyle seems to have interpreted it, who will receive the property, but also who will *not* receive it.

██ Proper counseling about the nature and consequences of a bequest to a disqualified person therefore requires the attorney to ensure the testator understands (1) the nature of the property bequeathed; (2) that a disqualified person will receive the property; and (3) that the "natural objects" of the testator's bounty, if any, will not receive the property. The certifying attorney must also ensure the testator voluntarily intends this result and does not believe himself or herself to be under any compulsion, whether legal, financial or otherwise, to make the bequest. This may require the certifying attorney to confirm, for example, the testator is aware the disqualified person has already been fully compensated for the services provided to the testator or otherwise has no legal claim on the testator's bounty. ██ While Coyle appears to have confirmed Winans's awareness of the nature of the Forestville property and his intent to give it to Timar, the remainder of his counseling was, at best, weak. There is no evidence, for example, Coyle discussed with Winans his decision to exclude appellants, or even that Coyle was fully aware of the identity of the natural objects of Winans's bounty.

Appellants also argue the counseling session, which lasted between one and five minutes, was too brief and occurred too late in the process to be effective, since the will had already been prepared and read when the counseling occurred. Timar responds that, while the counseling session at the time of execution of the will lasted only a short time, Coyle had extended discussions with Winans prior to the preparation of the will that should be included when considering the extent of Coyle's counseling under the statute.

██ In every situation to which section 21350 applies, the attorneys involved in preparing the will, if they are acting competently and in good faith, will have discussed the required subjects with the testator as part of the drafting process. Because the statute expressly requires the independent attorney to review the "instrument," section 21351, subdivision (b) necessarily anticipates a counseling session subsequent to and separate from that process. To include Coyle's earlier discussions with Winans as counseling under the statute would undercut this intent and weaken the nature and significance of the separate counseling session.

2. *Confidentiality*

██ Section 21351, subdivision (b) does not specifically require the counseling to be "confidential," but the text of the certificate states, "I am so disassociated from the interest of the transferee as to be in a position to advise my client independently, impartially, and confidentially as to the

consequences of the transfer. *On the basis of this counsel*, I conclude that the transfer, or transfers, . . . are valid because the transfer, or transfers, are not the product of fraud, menace, duress, or undue influence." (Italics added.) Because the certificate must be executed "on the basis" of independent, impartial, and confidential counsel, we agree with appellants the statute requires the counseling to occur confidentially. Timar does not contend otherwise.

Appellants correctly point out that most of Coyle's conversations with Winans were conducted under less than confidential conditions. Timar was described as "in and out" of Winans's room during the various consultations that occurred prior to execution of the will, and the door to his room was sometimes open. Because Winans was hard of hearing, the conversations could likely be overheard by Canterbury staff or other residents and visitors. Both attorneys testified, however, that the session during which the will was executed occurred with the door closed and in the presence only of Coyle, Lowenthal, and a notary public who was present to witness the signing.

██ The statute does not define "confidential," and the dictionary definition of "private, secret" is of little help in this context. (Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 241, col. 2.) Plainly, the best practice is to hold the counseling session in complete privacy, with only the testator and the certifying attorney present. The task of the certifying attorney is to ensure the testator understands the implications of his or her bequest and to attempt to determine whether the bequest has been improperly secured. This is best accomplished if the testator is able to speak frankly with the certifying attorney, and such frankness is most likely to be achieved by counseling in complete privacy.

Nonetheless, we are unwilling to adopt such a bright line rule, recognizing there might be circumstances under which a third party's presence would be necessary to effect the counseling. Appellants urge us to adopt the standard of Evidence Code section 952, which defines " 'confidential communication between client and lawyer' " for purposes of the statutes governing evidentiary privilege as "information transmitted between a client and his or her lawyer . . . by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted . . . ." (See *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736].) While Evidence Code section 952 may capture the general idea, the confidentiality concerns underlying privilege are

fairly removed from those of Probate Code section 21351. The complexity of the Evidence Code section 952 definition is unnecessary here.

■ Viewing the meaning of the words in context and in light of the statutory purpose, we conclude the Legislature intended the counseling to occur under circumstances that would insulate the transferor from any improper influences giving rise to the donative transfer and encourage the transferor to speak frankly with the certifying attorney about those influences, if any. At a minimum, therefore, the disqualified person and any person associated with the disqualified person must be absent. Further, the counseling session must occur in the absence of any person whose presence might discourage the testator from speaking frankly with the attorney about the subject bequest. Accordingly, if any person other than the certifying attorney is present during a section 21351 counseling session, the burden is on the disqualified person to demonstrate the session was nonetheless "confidential" by showing the presence of the additional persons either (1) was necessary to accomplish the counseling session, or (2) did not interfere with the transferor's full and honest disclosure to the independent attorney regarding the transfer to the disqualified person.

Although Timar was absent during the counseling session before the will was executed, the presence of Lowenthal and the notary public raises a triable issue regarding the confidentiality of this session. It is clear neither person was necessary to accomplish the counseling. There is no evidence they assisted Coyle in any manner. Nor, on the evidence provided, can we conclude as a matter of law that neither person's presence interfered with Winans's full and honest communication with Coyle. As drafter, Lowenthal was acquainted with Timar and had been responsible for implementing the bequest. If undue pressure was involved, Winans would have been required to disavow his prior statements to Lowenthal in order to acknowledge the pressure, something he might have been reluctant to do in Lowenthal's presence. The notary public was a complete stranger to Winans. There is no testimony her presence was explained to Winans to his satisfaction, nor any other reason to believe he would have been at ease discussing an intimate and difficult subject in her presence. Because a triable issue of fact existed as to the confidentiality of Coyle's counseling, the trial court erred in concluding there was no triable issue of fact regarding the validity of the certificate of independent review.

3. *"Independent" Attorney*

Section 21351 requires the counseling attorney to be "independent." Appellants contend Coyle did not satisfy this requirement because he was designated

as executor in the will and therefore stood to recover a substantial fee if the will were submitted to probate.

The statutory text of section 21351, subdivision (b) does not define "independent." Timar argues we should adopt a definition from the language of the certificate, which requires the executing attorney to state: "I am so disassociated from the interest of the transferee as to be in a position to advise my client independently, impartially, and confidentially . . . ." Based on this language, Timar contends that the only independence sought by the Legislature was independence from the disqualified person.

■ We do not read the statutory language so narrowly. The term "independent" ordinarily means "[f]ree from the influence, guidance, or control of another or others" or "[n]ot determined or influenced by someone or something else." (American Heritage Dict. (2d college ed. 1985) p. 654, col. 2.) The Legislature's requirement of an "independent" attorney was intended to ensure that the testator was advised and the bequest was reviewed by an attorney whose personal circumstances permitted him or her to render a disinterested judgment about the validity of the bequest. In the context of section 21351, therefore, the term "independent" is synonymous with "disinterested." If an attorney's relation to the individuals involved or the will itself prevented the attorney from forming a disinterested judgment about the bequest, that attorney could not be considered "independent" for purposes of section 21351. While dissociation from the interests of the beneficiary is certainly a part of such independence, it alone is not sufficient.

■ There is no indication the Legislature intended the certificate's language to constitute a comprehensive definition of the term "independent." On the contrary, there is some evidence from the statutory history that the Legislature had a somewhat broader definition in mind. As originally enacted in 1993, former section 21351, subdivision (b) required the donative instrument to be "reviewed by an attorney not related to, or associated with, the drafter or the beneficiary of the transfer."[9] By including dissociation from both the will's drafter and the beneficiary, this definition was broader than the current certificate language. Two years later, the Legislature substituted the phrase "an independent attorney" for the phrase "an attorney not related to, or associated with, the drafter or the beneficiary of the transfer" in the original

---

[9] In contrast, the certificate required by the original legislation stated only that the attorney had counseled the client and concluded there was no undue influence, without requiring the attorney to state that the counsel given was independent, impartial, and confidential. (Stats. 1993, ch. 293, § 8, pp. 2021, 2022.)

statute.[10] (Stats. 1995, ch. 730, § 14, p. 5481.) The change does not appear to have been made for the purpose of narrowing the meaning of the statute. If anything, the Legislature's substitution of the general term "independent" for the more specific definition suggests an intent to create a broader requirement.

Based on this history, the word "independent" would entail, at a minimum, "an attorney not related to, or associated with, the drafter or the beneficiary of the transfer." There is no reason in the statutory language or history, however, to confine the term to that specific meaning, rather than applying a more general definition derived from the plain meaning of the language, construed in the context of the statute. For the reasons stated above, we conclude that the general definition best suits the statute's purpose.[11] Accordingly, an attorney is "independent" for purposes of section 21351 if the attorney's personal circumstances do not prevent him or her from forming a disinterested judgment about the validity of the bequest.

There is clearly a triable issue of fact as to Coyle's ability to form a disinterested judgment about the validity of the bequest. As appellants argue, Coyle was designated as executor of the will. Because of the large size of the estate, his statutory fee as executor would be quite large. Had he refused to certify the bequest to Timar, he could have placed his participation as executor in jeopardy, thereby risking loss of the fee. In addition, Coyle shared an office with the drafter, Lowenthal, and had been involved in Winans's formulation of his bequests. Together, these factors raise a triable issue of fact as to Coyle's ability to evaluate the validity of the bequest to Timar with disinterest. For this reason as well, the trial court erred in granting summary judgment regarding the validity of the certificate of independent review.

B.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[10] At the same time, the current language was added to the certificate requiring the attorney to state that he or she is disassociated from the interests of the disqualified person. (Stats. 1995, ch. 730, § 14, pp. 5481, 5482.)

[11] Timar also argues we should adopt the definition of "independent attorney" found in a recent report of the California Law Revision Commission, which was directed by the Legislature in 2006 to study various aspects of donative transfer restrictions. (Stats. 2006, ch. 215, § 1.) The report recommends defining "independent attorney" to require an attorney with no "legal, business, financial, professional, or personal relationship" with the disqualified person. (Recommendation: Donative Transfer Restrictions (Oct. 2008) 38 Cal. Law Revision Com. Rep. (2008) pp. 133–134, 145.) The report provides no explanation for the source of the proposed definition, and we find it unpersuasive as evidence of legislative intent.

*See footnote, *ante,* page 102.

## III. DISPOSITION

Because we find a triable issue of fact with respect to the validity of the certificate of independent review and the issues of undue influence and testamentary capacity, summary judgment on appellants' will contest is reversed. The matter is remanded to the probate court for further proceedings consistent with this decision.

Marchiano, P. J., and Dondero, J., concurred.