[No. B229653. Second Dist., Div. Four. Oct. 31, 2011.]

FLORENTINA HERNANDEZ et al., Plaintiffs and Respondents, v. PATRICIA CLAUDINE KIEFERLE, as Trustee, etc., Defendant and Appellant.

### Counsel

Avner & Avner, Correy B. Avner; Law Offices of Becky Walker James and Becky Walker James for Defendant and Appellant.

Wilson, Wilson & Perrizo and Daniel J. Wilson for Plaintiff and Respondent Florentina Hernandez.

Law Offices of Jeffrey A. Coleman and Jeffrey A. Coleman for Plaintiff and Respondent Emigdio Hernandez.

### Opinion

**MANELLA, J.**—In the underlying action, the probate court invalidated an amendment to a trust that made appellant Patricia Claudine Kieferle trustee and sole beneficiary of the trust estate. The probate court ruled that the amendment failed under Probate Code section 21350 et seq., which establishes a rebuttable presumption that testamentary transfers to "care custodians" are the product of fraud, duress, menace or undue influence.[1] We conclude that the court erred in failing to apply the exception to the presumption found in section 21351, subdivision (a), where the transferor is "related by blood or marriage" to the transferee. We therefore reverse the probate court's orders.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *First and Second Amendments to Gertrude G. Kieferle's 2004 Trust*

Gertrude G. Kieferle was born in 1920. Appellant Patricia Claudine Kieferle (Claudine) is Gertrude's stepdaughter from Gertrude's marriage to

---

[1] All further statutory citations are to the Probate Code, unless otherwise noted.

Eugene J. Kieferle.[2] Although Eugene had several daughters, including Claudine, Gertrude had no children of her own. In 1994, respondents Florentina Hernandez and Emigdio Hernandez became Gertrude and Eugene's next-door neighbors. The following year, Claudine moved to Alaska. After Eugene died in 1997, Claudine had little contact with Gertrude from 1998 to 2004.

In June 2004, Gertrude executed a will and established the trust at issue in this action. The will transferred Gertrude's estate to the trust. Under the original terms of the trust, upon Gertrude's death, Florentina Hernandez was to receive $10,000 from Gertrude's estate, but no property was to be distributed to Claudine. In August 2004, Gertrude amended the trust to name the Hernandezes as the trustees upon her death and as principal beneficiaries of the trust estate (first amendment).[3]

On February 15, 2008, shortly after Claudine began a visit with Gertrude, Gertrude executed a new will and again amended the 2004 trust (second amendment). The will revoked all previous wills, bequeathed Gertrude's estate to the trust, and named Claudine as her executor. The second amendment to the trust revoked the key provisions of the first amendment, substituted Claudine for the Hernandezes as trustee upon Gertrude's death, and made Claudine the sole beneficiary of the trust estate. On May 27, 2008, Gertrude died.

### B. Underlying Proceedings

#### 1. Petitions

On July 10, 2008, Claudine filed a petition as trustee, seeking an order confirming as trust assets a bank account, a car, and Gertrude's personal effects. On August 29, 2008, the Hernandezes, asserting their status as trustees and beneficiaries under the first amendment, filed a petition challenging the second amendment. Their petition alleged that Gertrude lacked the mental capacity to execute the second amendment, and that the second amendment was the product of "fraud, misrepresentation, elder abuse, and

---

[2] As the pertinent members of the Kieferle family share a surname, we henceforth refer to them by their first name. Because appellant ordinarily calls herself "Claudine," we apply this name to her.

[3] Under the first amendment, the only other beneficiaries were two of Gertrude's friends, each of whom was to receive $5,000.

undue influence." The Hernandezes requested an order confirming their status as trustees, invalidating the second amendment, and directing an accounting. In response, Claudine filed a motion to dismiss the Hernandezes' petition, contending that they lacked standing to submit a petition or otherwise intervene in the action. She maintained that the first amendment was the product of undue influence by the Hernandezes, and that the transfer of property to them failed under the care custodian presumption (§ 21350 et seq.).

The probate court conducted a bench trial on the Hernandezes' petition. The trial began on November 30, 2009, but was interrupted by a lengthy continuance. On December 21, 2009, during the trial, the Hernandezes filed a second petition, requesting the probate court to assume jurisdiction over the trust and order Claudine to post a $485,000 bond while she served as trustee. In support of the petition, they argued that only $1,000 remained in a trust-held bank account that once had a balance of $441,690.65.[4]

### 2. The Hernandezes' Evidence

Beginning in the late 1980's, Eugene and Gertrude obtained estate planning services from Attorney Stephen Oliver, who helped them create, amend, and revoke several wills and trusts. After Eugene's death, Oliver prepared a trust for Gertrude in 2000, and later prepared the 2004 trust and the first amendment to it. None of the wills and trusts he drafted for Eugene or Gertrude distributed property to Claudine or gave her authority over their estates.

Oliver testified that he did not prepare the will and second amendment to the 2004 trust that Gertrude executed on February 15, 2008. Aside from the substitution of Claudine's name for the Hernandezes' names, the language of the documents closely resembles the will and first amendment that Gertrude executed in 2004, although their print style differs from the 2004 documents.

Florentina Hernandez testified as follows: She and her husband became Gertrude and Eugene's neighbors in 1994, and established a friendship with them. According to Hernandez, Gertrude often said that she hated Eugene's

---

[4] On February 8, 2010, during trial, the probate court asked Claudine to submit a description of her expenditures from the estate's bank accounts, which she provided.

children. Hernandez never saw Claudine in Gertrude's company before June 2007, when Claudine visited Gertrude.

After Eugene died in 1997, Hernandez and Gertrude became closer friends. Until mid-2004, Gertrude cared for herself, although Hernandez occasionally bought food for her and helped her in other ways. In May or June 2004, a fall injured Gertrude, who then moved temporarily to a nursing home. When Gertrude returned to her home in August 2004, she hired a caregiver to assist her. From 2005 to 2008, at Gertrude's request, Hernandez sometimes wrote checks on Gertrude's accounts payable to herself, cashed them, and gave the cash to Gertrude. At trial, Hernandez maintained that her assistance to Gertrude did not render her a caregiver. An excerpt from Hernandez's deposition was admitted, which disclosed that Hernandez had acknowledged preparing meals, doing laundry, and performing other tasks for Gertrude.

Hernandez also testified that in late January 2008, before Claudine began living with Gertrude, the Hernandezes and Gertrude met with Attorney Blanca Pacheco. According to Hernandez, she arranged the meeting after Gertrude asked her to obtain a power of attorney enabling the Hernandezes to make medical decisions for Gertrude. Hernandez further stated that Pacheco prepared the power of attorney, but that Gertrude failed to pay for it because she was too ill.

Hernandez maintained that she played no role in the creation of Gertrude's 2004 trust and the two amendments to it. According to Hernandez, she first learned that she was a beneficiary of Gertrude's estate under the first amendment in September 2004, when Gertrude gave her copies of the trust documents. Later, Hernandez also safeguarded the original documents for Gertrude, at Gertrude's request. On February 11, 2008, while Claudine was residing with Gertrude, Hernandez inquired whether Gertrude wanted her to return the original documents. Gertrude initially rejected the offer, explaining that the documents would anger Claudine. Two days later, Gertrude asked for the documents, and Hernandez returned them. Hernandez heard nothing more regarding the documents after she left them with Gertrude.

Cesar Macedo, a financial consultant, testified that he had known Gertrude for seven years and had met with her over a dozen times, both at the bank where he previously worked and in Gertrude's home. On February 14, 2008, Gertrude phoned Macedo and asked him if he would notarize some documents. The following day, he went to Gertrude's home. When he arrived,

Gertrude had the documents in her lap. After reviewing them, he discussed the documents with Gertrude. According to Macedo, Gertrude was engaged and aware and did not appear to be in distress. Had she appeared "any different" from the woman he had known, he would have "walked away." He notarized the amendment and served as a witness to the will. At trial, Macedo testified that although Claudine talked to him in the room in which Gertrude was sitting, he did not recall whether she was present when Gertrude signed the documents, as she was mostly out of his line of sight while he was conversing with Gertrude. An excerpt from Macedo's deposition was admitted, in which he stated that Claudine was present when the documents were executed.

Susan Bernatz, a psychologist, opined that on February 15, 2008, Gertrude was susceptible to undue influence by others, in view of her dementia, cognitive impairments, and medical problems. On cross-examination, Bernatz testified that Gertrude was similarly susceptible to influence by the Hernandezes when she executed the first amendment in 2004.[5]

### 3. *Claudine's Evidence*

Shirley and Craig Wise testified that in 1979, they began living near Gertrude and became her close friends. After Gertrude's husband Eugene died, they included her in their family life, helped her with her laundry, shopping, and bills, and drove her to her hairdresser. According to Shirley Wise, Gertrude repeatedly said that of Eugene's children, Claudine was the only one with whom she kept in touch. In 2001 or 2002, Gertrude also began to say that Florentina Hernandez was "jealous" of anyone who visited her; in addition, the Wises noticed that Hernandez quickly came to Gertrude's house whenever they paid Gertrude a visit. In 2004, Gertrude accused Craig Wise of stealing $6,000 from her. Although Gertrude had merely misplaced the money, the incident estranged the Wises from Gertrude, resulting in greater contact between Gertrude and the Hernandezes, who began to provide her with more care.

In January 2008, Gertrude renewed her friendship with the Wises, and told them that Claudine was "coming down" from Alaska. Gertrude appeared to

---

[5] Aside from these witnesses, the Hernandezes also presented testimony from Carla Arpino and Karen Lafferty, Claudine's sisters. Arpino denied that Claudine had "always had a loving relationship" with Gertrude, but acknowledged that she had no personal knowledge of their relationship during the pertinent period. Lafferty testified that Claudine was unhappy to leave Alaska to attend Gertrude, and did so only because no one else could care for her.

be very happy to see Claudine. According to the Wises, Gertrude said that Florentina Hernandez "want[ed] to put [her] in the looney bin" and "[was] trying to get [her] money."

Patrick Penisten, Claudine's husband, testified that in 2007, he and Claudine spoke by phone to Gertrude almost weekly. During the conversations, Gertrude said that Hernandez was "trying to put [her] in a looney bin." In January 2008, she asked Claudine to visit her because she did not want "to stay in a home."

Claudine testified that she often spoke to Gertrude by phone before 1998, but had little contact with her between 1998 and late 2004.[6] In late 2007, Gertrude began telling her by phone that Florentina Hernandez "was putting her under a lot of pressure." At Gertrude's request, Claudine began a visit with her on January 30, 2008. In early February 2008, Gertrude was hospitalized. After Gertrude was released from the hospital, she received care during the day from Keila Carrillo, who worked for Gertrude. According to Claudine, after Carrillo went home in the evening, Gertrude needed little or no care because she was usually asleep. Claudine changed Gertrude's diaper or otherwise assisted her only when necessary.

Claudine denied that she influenced Gertrude to execute the will and second amendment; she also denied any knowledge regarding how the documents were prepared. According to Claudine, Gertrude owned no typewriter or computer; furthermore, Claudine had only a laptop computer that lacked a printer. Claudine further testified that on or about February 11, 2008, Florentina Hernandez brought a package of documents to Gertrude. Claudine did not know the contents of the documents or discuss them with Gertrude. On February 15, 2008, when Macedo appeared at Gertrude's house, Claudine was unaware that Gertrude had asked him to help her execute the will and second amendment. After Claudine escorted Macedo to the room where Gertrude was seated, Claudine engaged in small talk and then left the room. One or two weeks later, after Gertrude gave Claudine the will and related trust documents, she learned that she was a beneficiary of Gertrude's estate.

Keila Carrillo testified that she became Gertrude's caregiver in mid-August 2004. According to Carrillo, before she began working, Florentina Hernandez provided care to Gertrude. In 2005, Gertrude told her that Hernandez

---

[6] As the Hernandezes called Claudine as an adverse witness (Evid. Code, § 776), we include her testimony within her own evidence.

mistreated her, and refused to return documents to her. On February 15, 2008, Carrillo served as a witness to Gertrude's will. Carrillo testified that Claudine was not in the room where the will was executed. Carrillo did not know who prepared the will.

Dr. Hung Nguyen, who treated Gertrude in 2007 and 2008, testified that from October 2007 to March 2008, Gertrude was mentally competent to make decisions.[7] In addition, Dr. James Spar, a geriatric psychiatrist, opined that although Gertrude began to suffer from dementia in 2004, she possessed testamentary capacity on February 15, 2008. According to Spar, Gertrude's mental impairments rendered her vulnerable to influence from caregivers between 2004 and 2008.[8]

### 4. *Posttrial Rulings*

On May 21, 2010, the probate court issued a proposed statement of decision containing tentative findings and rulings. The court found that Claudine had a lengthy and strong relationship with Gertrude; that Claudine knew nothing regarding Gertrude's various estate plans; that she did not know that Gertrude intended to change her estate plan in 2008; and that the 2008 changes did not unduly benefit Claudine. The court concluded that the second amendment was not the product of undue influence by Claudine under the common law doctrine of undue influence.[9] The court also found that Florentina Hernandez was aware that Gertrude often changed her estate plan in favor of the person closest to her at a specific time; that Hernandez tried to intervene in Gertrude's relationships with her close friends; and that the Hernandezes attempted to exercise control over Gertrude before and during Claudine's 2008 visit. In view of these tentative findings, the court stated its intent to deny the Hernandezes' petitions.[10] Both sides raised numerous objections to the proposed statement of decision.

At a hearing on August 5, 2010, the probate court stated that it had erred in failing to consider, as a threshold issue, whether Claudine was Gertrude's

---

[7] Although the Hernandezes called Dr. Nguyen as a witness, we include his testimony within Claudine's evidence, as he was examined regarding a declaration he submitted in support of Claudine.

[8] Claudine also presented testimony from Attorney Blanca Pacheco, who stated that Gertrude was quiet but unconfused and responsive when she and the Hernandezes met with Pacheco on January 27, 2008.

[9] Although the Hernandezes did not contend at trial that Claudine had been Gertrude's caregiver, the court's proposed decision expressly found that Claudine "was not in a confidential relationship with Gertrude such that she would be defined as a caregiver or other disqualified person under Probate Code §21350."

[10] The court otherwise deferred its ruling on Claudine's petition to confirm estate assets, and found it unnecessary to rule on her motion to dismiss the Hernandezes' petition to invalidate the second amendment.

"caregiver" when the second amendment was executed and thus whether, under section 21350, subdivision (a)(6), she was presumptively disqualified from taking under the trust.[11] On August 16, 2010, the court issued its final statement of decision. Many of its findings remained unchanged, including its determinations that Gertrude had testamentary capacity when she executed the second amendment and will, that Gertrude had personally asked Macedo to notarize the documents, that Gertrude was not under duress, and that she appeared to understand the documents when she signed them. The court further found no evidence that Claudine had "actively procure[d]" the second amendment for purposes of the common law doctrine of undue influence. However, the court found that Claudine was a qualified caregiver when Gertrude executed the 2008 documents, and that in light of the absence of evidence as to "who and/or how the documents in question were drafted or prepared," Claudine had failed to rebut by clear and convincing evidence the statutory presumption that the transfer to her was the product of undue influence. In view of these findings, the court granted the Hernandezes' petition to invalidate the second amendment and granted the relief sought in their second petition.[12]

In response to the proposed orders, Claudine submitted additional briefing, contending that she was statutorily exempt from the care custodian presumption. Specifically, she argued that she was exempt under section 21351 because she was related to Gertrude by "blood or marriage" as Gertrude's "heir," by virtue of being the daughter of Eugene, who had predeceased Gertrude by less than 15 years (§ 21351, subds. (a), (g); see § 6402.5, subd. (a)(1)). On October 1, 2010, the probate court entered an order barring Claudine from transferring estate assets and requiring her to post a $485,000 bond, or alternatively, deposit $485,000 in a blocked bank account. On October 15, 2010, the court entered a second order declaring the second amendment invalid, confirming the Hernandezes as Gertrude's successor trustees, and directing an accounting. On December 14, 2010, the court denied Claudine's motions to vacate or rescind the orders which contended, inter alia, that Claudine was exempt from the presumption as Gertrude's heir.[13] This appeal followed.

---

[11] The statement at the hearing is at odds with the court's previous finding in its proposed statement of decision that Claudine's relationship with Gertrude was "not . . . such that she would be defined as a caregiver or other disqualified person under Probate Code §21350."

[12] The probate court further found that Hernandez was not Gertrude's caregiver when Gertrude established the 2004 trust and executed the first amendment. The court deferred ruling on Claudine's petition to confirm estate assets and found it unnecessary to rule on her motion to dismiss the Hernandezes' petition to invalidate the second amendment.

[13] Neither in its October 15, 2010 order nor in its subsequent orders did the court expressly address the applicability of section 21351.

## DISCUSSION

Claudine contends (1) that the probate court erred in applying the care custodian presumption to her, (2) that the Hernandezes lacked standing to assert their petitions, and (3) that the probate court was biased against her. For the reasons explained below (see pt. A.2., *post*), we agree that the probate court's orders dated October 1 and 15, 2010, must be reversed because Claudine falls within the exception to the care custodian presumption set forth in section 21351 as an heir of the transferor related by blood or marriage. This renders her second contention moot. As we also discern no judicial bias (see pt. B., *post*), we conclude the matter is properly remanded to the same judge for further proceedings.

### A. *Care Custodian Presumption*

█ We begin with Claudine's contentions regarding the care custodian presumption. This statutory presumption "supplements the common law doctrine that 'a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument.' [Citations.]" (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800 [47 Cal.Rptr.3d 248, 139 P.3d 1196] (*Bernard*), quoting *Rice v. Clark* (2002) 28 Cal.4th 89, 97 [120 Cal.Rptr.2d 522, 47 P.3d 300].) Here, the probate court's determination that the second amendment is invalid relies entirely on the application of the care custodian presumption, as the court found that the Hernandezes had not shown that Claudine had actively procured the second amendment, for purposes of the common law doctrine. Accordingly, the focus of our inquiry is on the statute governing the care custodian presumption.

### 1. *Statutory Scheme*

█ The statutes in question were originally enacted in 1993, "in response to reports that a probate attorney had exploited his elderly clients by drafting estate plans for them including large gifts to himself and his confederates." (*Estate of Pryor* (2009) 177 Cal.App.4th 1466, 1471 [99 Cal.Rptr.3d 895].) As our Supreme Court has explained, in its current form, the statutory scheme "sets forth certain limitations on donative transfers by testamentary instrument. Section 21350 lists seven categories of persons who cannot validly be recipients of such donative transfers, including, inter alia, '[a] care custodian of a dependent adult who is the transferor' (*id.*, subd. (a)(6)). . . . [¶] . . . [¶] Once it is determined that a person is prohibited under section 21350 from receiving a transfer, 'section 21351 creates a rebuttable presumption that the transfer was the product of fraud, duress, menace, or undue

influence. . . .' " To rebut that presumption, " 'the transferee must present clear and convincing evidence, which does not include his or her own testimony, that the transfer was not the product of fraud, duress, menace, or undue influence. (§ 21351, subd. (d).)' " (*Bernard, supra,* 39 Cal.4th at pp. 799–800, fn. omitted, quoting *Estate of Shinkle* (2002) 97 Cal.App.4th 990, 993 [119 Cal.Rptr.2d 42], disapproved on another point in *Bernard, supra,* at p. 816, fn. 14.)

The prohibition in section 21350 is subject to several exceptions. Pertinent here is subdivision (a) of section 21351, which provides that section 21350 does not apply when "[t]he transferor is related by blood or marriage to . . . the transferee . . . ." Regarding this exception, subdivision (g) of section 21351 states: "[f]or purposes of this section, 'related by blood or marriage' shall include persons within the fifth degree or heirs of the transferor." These provisions establish an exception to the presumption of invalidity established in sections 21350 and 21351, subdivision (d).[14] (*Estate of Pryor, supra,* 177 Cal.App.4th at p. 1471.)

### 2. *"Blood or Marriage" Exception*

Claudine raises several challenges to the application of the care custodian presumption to her. As explained below, we conclude that she is not subject to the presumption because she falls under the "blood or marriage" exception as an "heir[] of the transferor" (§ 21351, subds. (a), (g)).[15]

The key issue before us concerns the interpretation of the term "heir," for purposes of the exception. Section 44 defines "heir" to mean "any person, including the surviving spouse, who is entitled to take property of the decedent by intestate succession under [the Probate Code.]" Under section 6402.5, which falls within the provisions governing intestacy (§ 6400 et seq.), the children of the decedent's predeceased spouse may in some circumstances take the decedent's property. Subdivision (a) of section 6402.5 states: "For purposes of distributing real property . . . [,] if the decedent had a predeceased spouse who died not more than 15 years before the decedent and there is no surviving spouse or issue of the decedent, the portion of the decedent's

---

[14] Section 21355 provides that the statutory scheme in question applies only to instruments that became irrevocable between September 1, 1993, and January 1, 2011, and that the scheme shall remain in effect only to January 1, 2014. In 2010, the Legislature enacted section 21360 et seq., which implements a revised form of the presumption at issue here for instruments that become irrevocable on or after January 1, 2011 (Stats. 2010, ch. 620, § 7).

[15] In view of this conclusion, we do not address Claudine's related contentions, namely, (1) that the Hernandezes never alleged at trial that she was subject to the presumption, (2) that the finding that she was a care custodian fails for want of substantial evidence, and (3) that her showing would rebut the presumption if it were applicable to her. For similar reasons, we need not address Claudine's contention that the Hernandezes lacked standing to file their petitions.

estate attributable to the decedent's predeceased spouse passes as follows: [¶] (1) If the decedent is survived by issue of the predeceased spouse, to the surviving issue of the predeceased spouse . . . ." Here, it is undisputed that Claudine is the daughter of Eugene, who died in 1997, approximately 11 years before Gertrude died in 2008. Claudine thus maintains that she is Gertrude's heir, for purposes of the "blood or marriage" exception.

The Hernandezes urge us to reject this contention on several grounds, which we examine below. Their principal arguments rely on the fact that subdivision (a)(1) of section 6402.5 provides for intestate distribution to the child of a predeceased spouse *only* with respect to a specified type of property, namely, "the portion of the decedent's estate attributable to the decedent's predeceased spouse." They thus contend that Claudine is properly viewed as an heir only if Gertrude's estate encompassed real property from Eugene that would pass to Claudine through intestate distribution; in addition, they assert there is no evidence that Gertrude's estate included real property from Eugene.[16] More broadly, they argue that for purposes of the "blood or marriage" exception, the term "heir" should include only persons demonstrably entitled to property through the intestacy statutes. Unless there is "some limitation and boundary" to the exception, they maintain, "the policy behind the statutory scheme would not be promoted." (Italics omitted.)

■ As the issue before us concerning the term "heir" is one of statutory interpretation, our task is " 'to ascertain and effectuate legislative intent.' " (*Bernard, supra*, 39 Cal.4th at p. 804, quoting *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) To determine intent, "[w]e look to the words of the statute itself, giving significance to every word, phrase, sentence and part of an act in furtherance of the legislative purpose if possible. [Citation.] We must construe the statutory language in context, and the various parts of a statute 'must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' " (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1027 [53 Cal.Rptr.3d 390], quoting *People v. Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].)

■ Although "heir" is a technical term (*Wells Fargo Bank v. Title Ins. & Trust Co.* (1971) 22 Cal.App.3d 295, 299 [99 Cal.Rptr. 464]), its precise interpretation is controlled by the statute in which it appears (*Fiske v. Wilkie* (1945) 67 Cal.App.2d 440, 444 [154 P.2d 725] (*Fiske*); see also *Estate of Baird* (1955) 135 Cal.App.2d 333, 337 [287 P.2d 365] [the word "heir" is

---

[16] Claudine maintains there was no dispute that Gertrude and Eugene bought the home together and that Eugene's interest in the house passed to Gertrude upon his death in 1997. Claudine asked the court to take judicial notice of a grant deed recorded in 1979, showing that Gertrude and Eugene owned their house as joint tenants. The court did not rule on the request.

given technical meaning when otherwise "unexplained and uncontrolled by the context"]). As Witkin explains, within the intestacy statutes, the term refers to those persons "whom the law appoints to succeed at the decedent's death to his or her estate in case of intestacy, by virtue of the statutes of succession." (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 74, p. 137.) Generally, the current intestate succession statutes (§ 6400 et seq.) seek " ' "to carry out . . . the intent [that] a decedent without a will is most likely to have had," . . . at the time of death . . . .' " (*Estate of Burden, supra*, 146 Cal.App.4th at p. 1027.) The statutes identify certain types of property that may fall within a decedent's estate, insofar as it is not disposed of by will, and for each type of property, specify a rule for selecting the successor or successors to the particular type of property upon the decedent's death. (14 Witkin, *supra*, §§ 74–88, pp. 137–152.) Section 6402.5, which concerns "the portion of the decedent's estate attributable to the decedent's predeceased spouse," is one such rule; other provisions state rules for separate, community, and quasi-community property (§ 6401, subds. (a)–(c)).

■ Here, we confront the statutory scheme governing the care custodian presumption, which is not intended to distribute an intestate decedent's estate, but to protect "elderly or infirm testators" from " 'certain individuals . . . uniquely positioned to procure gifts . . . through fraud, menace, duress or undue influence.' " (*Estate of Swetmann* (2000) 85 Cal.App.4th 807, 818 [102 Cal.Rptr.2d 457], quoting *Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 256 [43 Cal.Rptr.2d 407].) As explained in *Estate of Winans* (2010) 183 Cal.App.4th 102, 113–114 [107 Cal.Rptr.3d 167], in enacting this scheme, "the Legislature sought to strike a balance between 'protecting prospective transferors from fraud, menace, or undue influence, while still ensuring the freedom of transferors to dispose of their estates as they desire and reward true "good Samaritans." ' " (Quoting Stats. 2006, ch. 215, § 1.) We therefore construe the term "heir" in light of these goals.

The parties present conflicting proposals regarding how the intestate successor rules determine an "heir[] of the transferor," for purposes of the "blood or marriage" exception to the care custodian presumption. (§ 21351, subds. (g), (a).) The Hernandezes advocate a narrow construction of the term "heir," under which no person is the transferor's heir unless—at minimum—the transferor's estate *actually* contained some type of property that would pass to the person under a successor rule if the transferor had died intestate. Accordingly, they argue that Claudine is not Gertrude's heir under the exception absent a showing that Gertrude's estate contained real property attributable to Eugene. In contrast, Claudine offers a broader construction of the term, under which a person is the transferor's heir if the person is identified as the transferor's successor under a rule of succession, regardless of whether the transferor's estate contained the type of property distributed

under the rule. She thus maintains that she is Gertrude's heir under the exception, independent of any showing that Gertrude's estate contained real property attributable to Eugene.

In our view, the "blood or marriage" exception incorporates the broad construction of "heir" described above. We find guidance on the question before us in *Fiske, supra,* 67 Cal.App.2d 440 and its progeny. In *Fiske,* the appellate court confronted a similar issue regarding Code of Civil Procedure former section 377, which provided: " 'When the death of a person . . . is caused by the wrongful act or neglect of another, his heirs . . . may maintain an action for damages against the person causing the death. . . .' " (*Fiske, supra,* at p. 444.) There, the plaintiffs' mother was killed in a car accident. (*Id.* at p. 442.) After they asserted wrongful death claims as her heirs, the trial court granted a nonsuit on their claims, concluding that the right to sue was community property that passed by intestate succession only to the decedent's husband. (*Id.* at pp. 442–443.)

In reversing the nonsuit, the appellate court reasoned, inter alia, that the term "heir," as used in Code of Civil Procedure former section 377, was intended to identify " 'a class of persons who, because of their relation to the deceased, are supposed to be injured by [the] death.' " (*Fiske, supra,* 67 Cal.App.2d at p. 444.) In view of this fact, the court concluded that "recovery is not limited to persons who would succeed to the money so recoverable if it had been in the possession of the community at the time of her death, but such recovery may be had by those persons who are *capable* of inheriting from the deceased person *generally.*" (*Ibid.,* italics added.) As the plaintiff children were entitled to succeed to a share of the decedent's separate property under the intestacy statutes, the court held that the plaintiffs were their mother's heirs, for purposes of Code of Civil Procedure former section 377. (67 Cal.App.2d at p. 444.)

Later, in *Desplancke v. Wilson* (1993) 14 Cal.App.4th 631 [17 Cal.Rptr.2d 586], the appellate court held that under Code of Civil Procedure former section 377, the successors to the decedent's separate property were "heirs," even though the decedent actually had *no* separate property. There, the decedent's wife and four children asserted a wrongful death action as the decedent's heirs. (*Desplancke v. Wilson, supra,* at p. 633.) The trial court granted summary judgment in favor of the defendant on the children's claims, reasoning that they were not heirs because the decedent's estate had consisted solely of community property that had passed in its entirety to his wife upon his death. (*Id.* at pp. 633–634.) Relying on *Fiske,* the appellate court reversed because the children *would* have been the successors to the decedent's separate property, had he possessed any such property. (*Id.* at pp. 634–635.)

■ Consistent with the holdings in *Fiske* and *Desplancke*, we conclude that the "blood or marriage" exception encompasses as heirs "those persons who are *capable* of inheriting from the deceased person *generally*" (*Fiske, supra*, 67 Cal.App.2d at p. 444, italics added), in the sense delineated above: a person is the transferor's heir if some intestate rule identifies the person as the transferor's successor, regardless of whether the transferor's estate includes the type of property distributed under the rule. Like former section 377 of the Code of Civil Procedure, the exception identifies classes of persons based on "their relation to the deceased" (*Fiske, supra*, at p. 444). As noted above, subdivision (g) of section 21351 states that the term " 'related by blood or marriage' " includes "persons within the fifth degree *or* heirs of the transferor" (italics added). As the phrase "persons within the fifth degree" describes relationships to the decedent not dependent on the types of property in the decedent's estate, the phrase "heirs of the transferor" is reasonably regarded as describing relationships that are similarly independent.

The Legislature's failure to confine the latter phrase expressly to property-dependent relationships is significant, as it knows how to do so. (See *Bernard, supra*, 39 Cal.4th at p. 811.) Included within the statutory scheme at issue is section 21353, which states: "If a transfer fails under this part, the transfer shall be made as if the disqualified person predeceased the transferor without spouse or issue, but *only to the extent that the value of the transfer exceeds the intestate interest of the disqualified person*." (Italics added.) Although the italicized portion of this provision does not directly concern the "blood or marriage" exception, it establishes that the Legislature could have attached an express property-dependent limitation to the phrase "heirs of the transferor" (for example, by specifying that the "intestate interest" of such heirs must have *some* value).

The interpretation of "heir" in question also facilitates the Legislature's goals in enacting the statutory scheme. As noted above, the scheme was intended to protect elderly or infirm transferors while preserving their freedom to dispose of their estates as they desire. (*Estate of Winans, supra*, 183 Cal.App.4th at pp. 113–114.) Because the intestacy succession rules were devised with an eye to identifying persons who were likely to have received property had the decedent made a will (*Estate of Burden, supra*, 146 Cal.App.4th at p. 1027), the interpretation of "heir" in question promotes the transfer of property to recipients whom the transferor is reasonably deemed likely to have favored with a testamentary gift. In contrast, the Hernandezes' *narrow* interpretation of "heir" ties the success of a transfer to a factor that no transferor would likely consider in making the transfer, namely, the composition of the transferor's estate for purposes of distribution under the rules of intestate succession.

■ The Hernandezes suggest that the broad interpretation of "heir" renders the "blood or marriage" exception limitless. We disagree. Under the rules of intestate succession, only those persons identified as *immediate* successors to the decedent's estate constitute "heirs." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1440, 1443 [111 Cal.Rptr.2d 534]; *Mayo v. White* (1986) 178 Cal.App.3d 1083, 1088 [224 Cal.Rptr. 373].) Although the rules specify sequences of persons and groups potentially eligible to share in the decedent's estate, no individual is ordinarily a "proper heir[] at law" unless the persons placed ahead of the individual under the rules cannot succeed to the estate. (*Mayo v. White, supra*, 178 Cal.App.3d at p. 1088; see *Chavez v. Carpenter, supra*, 91 Cal.App.4th at p. 1443.) As this established limitation on the term "heir" was imposed in connection with Code of Civil Procedure former section 377 (*Mayo v. White, supra*, 178 Cal.App.3d at p. 1088; *Coats v. K-Mart Corp.* (1989) 215 Cal.App.3d 961, 969 [264 Cal.Rptr. 12]), it is also properly applied to the "blood or marriage" exception.[17]

■ Because Claudine is Gertrude's heir under the "blood or marriage" exception, the probate court erred in invalidating the second amendment and determining that the Hernandezes were the trustees of the trust. In issuing its final statement of decision, the court found that Gertrude had testamentary capacity when she executed the second amendment, and that there was no evidence Claudine had actively procured the second amendment for purposes of the common law doctrine of undue influence. The court's findings thus provide no alternative basis to support the invalidation of the second amendment, which revoked the first amendment. Accordingly, the second amendment, rather than the first amendment, is the governing instrument.

In view of this conclusion, the court also erred in ordering an accounting and directing Claudine to post a bond. Although the court did not expressly explain why it required an accounting and a bond, its orders were evidently intended to protect the Hernandezes' interests in the trust. As explained above, however, the second amendment abrogated these interests; moreover, Gertrude's February 2008 trust and will provide that Claudine, as the trustee and executor, shall not be required to post a bond. In sum, the October 1 and 15, 2010 orders must be reversed in their entirety.

### B. *Allegations of Judicial Misconduct*

Aside from seeking reversal of the probate court's orders, Claudine asks this court, upon remand, to direct that the matter be assigned to a new judge

[17] In addition, the Hernandezes contend that Claudine necessarily falls outside the scope of the "blood or marriage" exception because Claudine is not related by blood to Gertrude, and Gertrude's marriage to Eugene ended upon his death. However, as explained above, the exception applies to Claudine because under section 21351, subdivision (g), the term " 'related by blood or marriage' " expressly includes "heirs." We decline to disregard this provision.

because the judge who conducted the underlying proceedings engaged in "multiple abuses of discretion render[ing] the trial and posttrial proceedings fundamentally unfair." Claudine contends that the probate court (1) arbitrarily curtailed the presentation of evidence, (2) engaged in biased questioning of witnesses, and (3) incorrectly rejected some of Claudine's posttrial submissions. We discern no improper conduct and decline to order the appointment of a new judge.

### 1. *Limitations on Evidence*

We begin with Claudine's contentions regarding the presentation of evidence. Generally, "the trial court has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact." (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 [77 Cal.Rptr.3d 305].) Nonetheless, in exercising this power, the trial court may not infringe the parties' "fundamental right to a full and fair hearing." (*Ibid.*) Claudine contends that the probate court improperly limited the examination of witnesses and presentation of evidence by her counsel. The record discloses, however, that the court acted only to enforce the parties' time estimates and agreements regarding evidence, and that on some occasions, the court permitted Claudine's counsel additional time in which to examine a witness.

Claudine maintains that the probate court improperly limited her counsel's examination of critical expert and medical witnesses. We disagree. On December 1, 2009, the court ended counsel's cross-examination of psychologist Susan Bernatz, explaining that he was "well over the time" he had estimated; as a result, the court later placed a time limit on his re-cross-examination. Later, during the afternoon session on December 2, 2009, the court attempted to ensure the examination of Dr. Hung Nguyen, whom counsel had apparently asked to arrive in court at 3:00 p.m. The court told counsel that under the parties' time estimates, he would have 17 minutes in which to cross-examine Dr. Nguyen. Nonetheless, to facilitate Dr. Nguyen's testimony, the court took no break and permitted counsel to conduct his cross-examination until it adjourned at 4:35 p.m. We further observe that any limitation on counsel's cross-examination did not prevent him from eliciting evidence favorable to Claudine: although Dr. Nguyen was classified as one of the Hernandezes' witnesses, his testimony on direct examination actually supported Claudine's position at trial (see fn. 7, *ante*).

Claudine also asserts that the probate court improperly limited her counsel's cross-examination of Florentina Hernandez. We reject this contention. On April 27, 2010, after a lengthy hiatus in the trial, counsel began his

cross-examination of Hernandez, which spanned two days. At the end of the first day, the court told counsel that under the parties' time estimates, he had one hour in which to complete his cross-examination. The next day, the court informed counsel that he had as much as two hours. Later, after counsel examined Hernandez regarding checks she had written on Gertrude's accounts, the court informed him that he had exhausted his allotted time. When he asked for more time to continue his questioning, the court denied the request, stating that although he had been allocated ample time to examine Hernandez, he had made inefficient use of it. On this record, we see no abuse of the court's authority to control the proceedings before it.

Finally, Claudine argues that the probate court improperly declined to admit certain exhibits. On April 28, 2010, at the end of trial, the court admitted a large number of exhibits. On May 6, 2010, Claudine asked the probate court to reopen the trial to permit the admission of additional exhibits. The court rejected the request, reasoning, inter alia, that Claudine had submitted no evidence that the Hernandezes had seen or possessed copies of the exhibits in question. As Claudine made no showing that she could not have offered the exhibits prior to the end of trial, the court did not err in refusing her request. (*Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1222–1223 [83 Cal.Rptr.2d 235].)

### 2. *Remarks During Trial*

▇▇▇ Claudine contends that on two occasions during trial, the probate court made remarks that rendered it an advocate for the Hernandezes. The court may question witnesses and comment on evidence, but it should not distort testimony (*Schnear v. Boldrey* (1971) 22 Cal.App.3d 478, 482–483 [99 Cal.Rptr. 404]) or make comments that "indicate more than a slight leaning to one side" (*Newman v. First California Co.* (1975) 47 Cal.App.3d 60, 68 [120 Cal.Rptr. 494]). No such misconduct occurred here.

The first incident occurred when Emigdio Hernandez's trial counsel examined Claudine regarding the extent to which she had assisted Gertrude after Gertrude's caregiver went home for the night. The court asked Claudine: "Miss Kieferle, the question that [counsel] is trying to ask you is[,] if no one else was there at any point in time after Miss Carrillo left the house, you were home alone with Gertrude, wouldn't you have been responsible for providing anything that she needed at that time?" Claudine answered, "Yes." We see nothing improper in this question, which addressed the admittedly relevant issue of Claudine's relationship with Gertrude during the time Claudine was staying with her.

The second incident occurred while Claudine's counsel was cross-examining Florentina Hernandez on financial benefits she had derived from

Gertrude during their 14-year relationship. Counsel directed Hernandez's attention to exhibits Nos. 262 and 263, which the Hernandezes had prepared as summaries of Claudine's exhibits Nos. 57 and 58, namely, a collection of checks that Hernandez had written on Gertrude's accounts, and a related set of checkbook registers. The court remarked: "[Counsel,] [Nos.] 262 and 263 were derived as a compilation from your exhibit [Nos.] 57 and 58. So, I don't think that your exhibits cover the entire 14-year time span. I am pretty sure they don't." As our inspection of exhibits Nos. 57, 58, 262, and 263 discloses that the checks in question were written between 2005 and 2008 and the registers covered the same period, the court's observation appears to be correct. Accordingly, the remark cannot reasonably be regarded as a biased or improper comment on the evidence.[18]

### 3. *Posttrial Submissions*

Claudine contends that after trial, the probate court incorrectly refused to take judicial notice of records conclusively establishing that she was Gertrude's heir, for purposes of the "blood or marriage" exception. The records showed that she was the daughter of Eugene, who had predeceased Gertrude by less than 15 years. Claudine maintains that the court, in ruling on the application of the exception to her, improperly "ignored these obviously relevant and indisputable documents." We disagree.

The documents were not relevant to the probate court's ruling: as the final statement of decision establishes, the court accepted Claudine's representations regarding her relationship to Eugene and the date of his death. It nevertheless impliedly rejected Claudine's argument that she was statutorily exempt from the care custodian presumption. This ruling on a question of law, though erroneous (see pt. A.2., *ante*), was not judicial misconduct.[19] In sum, there was no judicial misconduct supporting the appointment of a new judge upon remand.

---

[18] In addition, Claudine suggests that the probate court acted as an advocate for the Hernandezes by admitting copies of the wills and trusts that Attorney Oliver had prepared for Eugene and Gertrude, along with his record of their directions to him. Claudine objected that the documents were inadmissible under Evidence Code section 1101, subdivision (a), which generally bars evidence of past acts to prove subsequent conduct. The probate court concluded that the documents were admissible to show Eugene and Gertrude's intent in devising an estate plan. We see no error in this ruling, as the documents were admissible under Evidence Code section 1101, subdivision (b). (*Janisse v. Winston Investment Co.* (1957) 154 Cal.App.2d 580, 588 [317 P.2d 48] ["It is well settled that evidence of other transactions to show motive, intent, knowledge, plan, and absence of mistake, in both civil and criminal cases, is admissible."].)

[19] Claudine also contends that the probate court incorrectly directed its clerk to reject the exhibits that her counsel asked to be admitted after trial (see pt. B.1., *ante*). As the court did not err in declining to re-open trial, we see nothing improper in the court's direction to the clerk.

## DISPOSITION

The probate court's October 1 and 15, 2010 orders are reversed, and the matter is remanded to the probate court for further proceedings in accordance with this opinion. Upon remand, the court is directed to vacate the orders and enter new orders denying the Hernandezes' petitions in their entirety. Claudine is awarded her costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

Respondents' petition for review by the Supreme Court was denied January 18, 2012, S198508.